People of the State of Illinois, Plaintiff-Appellee, v. James Pecora, Defendant-Appellant.

Gen. No. 53,628.

First District, Fourth Division.

March 19, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Paul Bradley and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

William G. Clark, Attorney General of State of Illinois, of Springfield (Fred G. Leach, Assistant Attorney General, John J. Stamos, State's Attorney of Cook County, of Chicago, Elmer C. Kissane and Oliver D. Ferguson, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE DRUCKER delivered the opinion of the court.

This is an appeal from a judgment of the Circuit Court finding defendant guilty of the murder of his ex-wife, Carolyn Pecora, and sentencing him to the penitentiary for a term of not less than fourteen nor more than twenty years. The cause was transferred to this court from the Supreme Court.

Defendant raises three contentions on appeal: (1) the jury should have been instructed as to the law of voluntary manslaughter; (2) defendant was denied his right to fully present the defense of insanity by the improper rulings of the court in relation to certain evidence and testimony; and (3) defendant was denied a fair trial by the improper rulings and remarks of the trial judge and by the improper remarks and argument of the State's Attorney.

At a pretrial competency hearing defendant was found to be competent.

EVIDENCE

The State's evidence disclosed that Carolyn Pecora died on December 21, 1964, from a stab wound of the pulmonary artery; the autopsy showed twenty-one stab wounds in all. Defendant's statement, which was admitted without objection, is substantially as follows:

Defendant and the deceased, his ex-wife, had been in court on December 4 and 7, 1964, in a custody fight wherein the deceased was cited for immoral conduct before the children and placed on probation for a year. The children had seen her and another man in the nude.

287

Defendant learned that subsequent to the probation she had had two men in her house on different nights.

On the night of December 20, 1964, defendant took the deceased and their three children to a children's program at the church. After the program they had dinner and then the deceased insisted that defendant drop her off at the Vegas Lounge because she wanted to be alone for an hour. Defendant complied and took the children home. Defendant returned to the Vegas Lounge at 11:00 p. m. and found the deceased sitting with a man unknown to the defendant. She persisted in staying a few minutes longer and then returned to her house with defendant.

The deceased wanted some more to drink so defendant went out and purchased a pint of whiskey. They had intercourse and she told defendant that he did not know how to make love; that she had been intimate with five men and that she had had an abortion before she married defendant.

The next day (December 21, 1964) deceased called defendant at work in the afternoon and told him that she was going to take a nap. Defendant was worried about the children not getting fed so he went over to the house. As he arrived, deceased got up and defendant told her that he would prepare dinner. After he had fed the family and cleaned up the kitchen, he found his wife in the basement and he renewed the discussion of the night before in an attempt to effect a reconciliation. He begged her to stop her immoral conduct and to get together with him again; but she said that she did not want any part of it because she was having too good a time.

Defendant then went upstairs and put the children to bed, and shortly thereafter the deceased came upstairs to the living room. They got into an argument again about her conduct, but she said that she did not think that she was doing anything wrong. She kept ridiculing the defendant and he kept begging her to give themselves another chance. She was sitting in the living room

288

with a drink in her hand. Defendant took the drink away from her and asked her to please stop, she was very flip and defendant hit her with a knife taken from a rack on one of the cabinet doors in the kitchen. He hit her several times, dragged her to the basement steps and pushed her down the steps.

Testimony of Father John Grace, witness for the State:

He has been the assistant Pastor of St. Patrick's Church since the summer of 1965; before that he had been assigned to St. Mary's Church in Des Plaines for five years. The defendant was a member of St. Mary's and had sought spiritual counselling two or three times.

At about 7:30 or 8:00 p. m. on December 21, 1964, he received a phone call from the defendant requesting that he come to the deceased's house because the defendant had had a fight with her. The witness told the defendant that he would come as soon as he finished another appointment. A few minutes later the defendant called again and asked witness to hurry because defendant was "in deep trouble." Witness told defendant that he would have to bring the police, and defendant said, "Well, come right away."

Witness and Father Morgenthala proceeded to the police station and got Corporal Gibson and Trooper Lehman to go to the deceased's house with them. When they arrived, defendant told him that he had done something terrible; defendant seemed very worried about what was going to happen to his children. The house was in a state of general disorder; it appeared as if some sort of struggle had taken place in the living room.

On cross-examination the witness stated that he had counselled the defendant several times about his marital problems. The witness inquired about reconciliation, and the defendant seemed willing if it would help his children; defendant was more concerned with the welfare of his children than with reconciliation. He was concerned

with removing the children from an unhealthy, unwholesome environment.

Testimony of Leroy J. Osberg, witness for the State:
He has been a friend of the defendant for about fifteen years. At about 9:00 p. m. on December 21, 1964, he received a phone call from defendant in which defendant asked him to come over to the deceased's house and get their children because he had killed his wife. About thirty minutes later the witness arrived at the deceased's house and was admitted by a State Trooper; he saw the deceased's body from the top of the basement stairs but did not go down.

When he arrived at the house, the children were sleeping, and after a word with defendant, he went to see about the children. He did notice some spots on the rug after he heard some mention of blood spots during the interrogation of the defendant; the spots were wet.

Testimony of Guy Gibson, witness for the State:
He is a sergeant of the State Police. At the request of Fathers Grace and Morgenthala, he and Trooper Lehman went to the house of the deceased. Defendant admitted the four of them through the back door and told the witness, in response to a question, that his wife was on the back stairs. The witness found the deceased on the back stairs and tested her pulse. Finding no pulse he made various routine calls.

Awaiting the arrival of several people, the witness had a conversation with defendant in which the defendant described the action of the two evenings as recited in his written statement with these differences. (1) Defendant told the witness that he had gotten the knife from the kitchen and then had come back from the kitchen and continued the conversation with his wife for a few minutes. He then hit her with the knife, and he hit her several more times, when she began to scream, in order

to quiet her. He did not remember how many times he struck her. (2) After defendant pushed her down the stairs, he came back to the living room and attempted to clean up the blood; then he realized that something would have to be done about the children and he called Father Grace. (3) He said that he threw her body down the stairs and tried to clean up the blood so that the children would not see it.

When he went to check the deceased she was in a generally disorderly fashion with her head toward the left hanging over the open stairwell. A knife handle was protruding from the rectal area of the body.

The defendant's face was flushed, his eyes were red-rimmed and bloodshot, and he seemed very distraught. He was coherent at the times when the witness talked to him; the answers given the witness's questions were generally short and did not seem to be rambling in any sense.

Other police officers also testified in corroboration of the conditions found at the home of the deceased.

Testimony (in part) of William H. Haines, witness for the defense:

He is director of the Behavior Clinic of the Criminal Court of Cook County (he was qualified as an expert in the field of nervous and mental diseases).

He examined defendant in March 1965 to determine his ability to stand trial.* He diagnosed defendant as being able to cooperate with his counsel and having knowledge of the charge against him. It was also the suspicion of the witness that a paranoid state may be present in the defendant. The history used in this diagnosis concerned defendant's confinement in two mental institutions and a suicide attempt as revealed in a questionnaire of the defendant's mother.

---

* The trial commenced on March 1, 1966.

291

Testimony (in part) of Earl Solon, witness for the defense:

He is a medical doctor specializing in psychiatry. (The witness was qualified as an expert in psychiatry.)

He treated the defendant in 1963; as part of that treatment the defendant was hospitalized. Pursuant to subpoena the witness brought his own records in connection with the defendant's case.

Defendant first came to the doctor on August 22, 1963; at that time an interview was conducted to evaluate the defendant's emotional state and his complaints. There was no diagnosis at that time although there was a tentative impression. The tentative impression was that there was a paranoid illness present. At that time the defendant gave a partial history. Defendant told of acute depression, a recent suicide attempt, several previous suicide attempts, previous hospitalization and psychiatric treatment, and that he felt a great deal of emotional turmoil at that time and was looking for treatment to relieve him.

Defendant further indicated that the basis for his distress was his relationship with his ex-wife, and he felt that he was a martyr to her abuse of him. Defendant's feelings were quite strong about her; he felt that she was running around with other men and that he was forced to witness his children living with her under those circumstances.

A week later defendant returned for another appointment and gave further history. Witness's impression was that there was a schizoid personality present in the defendant with a paranoid reaction on top of that.

Additional information confirmed the doctor's original analysis, and with succeeding weeks he became more certain of his diagnosis.

Later in the month of September defendant was started on tranquilizers to diminish the intensity of feelings within him so that he would feel less strain, less anger

and less hostility towards his ex-wife. Defendant believed that she was running around and having affairs with other men and that she was depriving him of his rights to visit their children. After six visits, hospitalization was suggested. Defendant entered a hospital on November 10, 1963. He was discharged on November 25, 1963, and the doctor did not see him after that.

The doctor has no personal information concerning the events surrounding the death of the deceased; all he knows comes from news reports and talk around the hospital. Based on his medical training and background the doctor could not have an opinion as to whether or not on December 21, 1964, the defendant was suffering from a mental disease or mental defect to such a degree that he lacked sufficient capacity to appreciate the criminality of his actions. The witness was also unable to render an opinion as to whether defendant on December 21, 1964, was suffering from a mental disease or mental defect to such a degree that he was unable to conform his conduct to the requirements of the law.

Testimony (in part) of Norman Robertson, witness for the defense:

He is a clinical psychologist employed by the State of Illinois in the Department of Mental Health. He has a B.A. degree in psychology from Valparaiso University, an M.A. in psychology from Indiana University and has completed correspondence work for a Ph.D. in psychology from the University of Chicago. He has been certified by the State of Illinois. His work consists of doing therapy with people in need of psychiatric care. He also does diagnostic testing, evaluating the seriousness of illnesses, the implications, making recommendations about treatment, and whether suicide, homicide and things like that are a possibility. He has made two examinations of the defendant; once on the 14th and once on the 18th of November, 1965, pursuant to court order. Defendant

was given the Rorschach Test and the Thematic Apperception Test.

The tests revealed that defendant was a passive dependent character with a severe ego-weakness and potential for psychosis. He could not tell from the testing what sort of psychotic condition would or could exist.

Testimony of Guy Gibson, witness recalled for the State in rebuttal:

He is the same Sergeant Gibson of the Illinois State Police who testified previously. He does not believe that on December 21, 1964, the defendant had a mental disease or defect such that he lacked capacity to appreciate the criminality of his act or to conform his conduct to the law. He bases his opinion on the way defendant answered questions, on the obvious attempt to clean up the scene by wiping the rug and walls, and on his experience with other people who had been adjudged insane. He never had any medical training.

Testimony of Eugene Eccker, witness recalled by the State in rebuttal:

He has an opinion as to whether as a result of mental disease or defects the defendant lacked substantial capacity to appreciate the criminality of his conduct on December 21, 1964. His opinion is that the defendant knew what he was doing all the time. He also believes that defendant could conform his conduct to the requirements of the law. He bases his opinion on defendant's attempt to destroy physical evidence.

His education is high school equivalency; he did not graduate from any medical school or school of psychology.

Testimony of Alan Taylor, witness recalled by the State in rebuttal:

He never attended any medical school. He has a high school education plus several college courses in criminology. He does not think that the defendant lacked the

capacity to conform his conduct to the requirements of the law, nor does he think that the defendant suffered from any mental disease or defect that would make the defendant lack the capacity to appreciate the criminality of his act. He bases his opinion on the defendant's demeanor, his conversations which were lucid, the fact that defendant attempted to clean up the scene of the crime, and the fact that defendant asked him to get some clean clothes because he knew that his clothes were soiled.

OPINION

■ (1) Defendant argues that the trial court erred by not giving any instruction to the jury on voluntary manslaughter. It is the rule in homicide cases that if there is evidence in the record which, if believed by the jury, would reduce the crime to voluntary manslaughter, an instruction defining that crime should be given. People v. Jones, 384 Ill 407, 412, 51 NE2d 543. It is thus necessary to determine whether there is such evidence in the record of the instant case.

Voluntary Manslaughter is defined in the Criminal Code, Ill Rev Stats 1963, c 38, § 9–2, as follows:

> (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

> (1) The individual killed, or . . .

> Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

Further, there is a long line of case law which states that mere words can never be sufficient provocation to support voluntary manslaughter. People v. Russell, 322 Ill 295, 153 NE 389; People v. Marrow, 403 Ill 69, 85 NE2d 34. However, in the instant case defendant argues that the deceased's flaunting of her immoral conduct and

bragging about having had an abortion struck so severely at the defendant as to excite an intense passion in him. Defendant relies on two cases and also argues that a progressive view of the law leads to the conclusion that words alone can incite the required passion.

 The statute requires that the provocation be sufficient to excite passion in a "reasonable man." Thus any special traits of the particular defendant cannot be considered. The fact that the defendant has certain religious beliefs, that he had some mental disturbance and that he had not psychologically disengaged himself from the marital relationship since the divorce are not relevant on the question of provocation. We do not believe that the words of the deceased constituted sufficient provocation to reduce the crime to voluntary manslaughter, especially since the defendant already knew of the deceased's immoral conduct and since the defendant was no longer married to the deceased.

The cases relied upon by defendant are distinguishable from the instant case. In People v. Jones, 384 Ill 407, 412, 51 NE2d 543, the defendant (wife of the deceased) encountered her husband with another woman and stabbed her. The evidence was conflicting as to when deceased took out a knife and threatened to kill defendant. The court found that the jury indicated by its verdict that it did not believe that defendant acted solely in self-defense but in the heat of passion and that therefore a manslaughter instruction was proper. We see no similarity to the instant case where only words allegedly caused the provocation. In People v. Stepheny, 76 Ill App2d 131, 221 NE2d 798, defendant was charged with murder. At the trial there was some evidence that after a long quarrel the deceased pulled a gun on the defendant; thus the jury could have believed that the gun coupled with the exchange of words provoked the defendant. In the instant case there was no evidence of any provocation except the words of the deceased, and

the trial judge properly refused to instruct the jury on the law of voluntary manslaughter.

(2) Defendant next argues that he was denied his right to fully present his defense of insanity by improper rulings of the court in relation to certain evidence and testimony.

■ Defendant complains of the trial judge's refusal to recognize the psychologist Robertson as an expert and the judge's refusal to allow complete testimony concerning the analysis of psychological tests given to the defendant. The judge did refer to the witness several times as a "lay" witness but it is obvious that he was fearful that the tactics of the defense were to elicit a medical opinion as to sanity at the time of the crime from a nonmedical witness. The defendant acknowledged that he did not intend to question this witness on the ultimate question of the defendant's sanity, and the witness said, specifically, that his testing could not show what sort of psychotic condition existed. Eventually the witness was permitted to state what tests he gave and the results thereof. Although we do not condone the court's treatment of this witness, we cannot find that the actions of the judge constituted prejudicial error.

The defendant also complains that the judge did not let him put a proper hypothetical question to his psychiatrist and thereby precluded expert testimony on the main issue of the case. Although it seems that the defense began to frame a hypothetical question he did not finish it, and the defense attorney then specifically stated to the court that he was not attempting to propound a hypothetical question; there was no further attempt to put a hypothetical question to the psychiatrist. We cannot say that the trial judge deprived defendant of the opportunity to so question the psychiatrist.

■ ■ Defendant argues that the trial judge erred in his refusal to allow the brother of the deceased to testify concerning the nature of the relationship between

297

the defendant and the deceased. The insanity defense was based in part upon the relationship of the deceased and the defendant and the way in which he reacted to her; it is thus very relevant to establish the nature of that relationship. The witness could have properly rendered a layman's opinion of that relationship based upon his observation of it. However, although it was error to exclude this testimony, we find that the defendant was not prejudiced because he was adequately able through other means to establish the nature of his relationship with the deceased.

Defendant claims that the trial judge was under the mistaken impression that only evidence regarding defendant's mental state on the date of the crime was relevant. Defendant cites People v. Haun, 71 Ill App2d 262, 268, 217 NE2d 470, where the court held that "[g]reat latitude is normally afforded the defendant in the admission of evidence as to mental condition." However, the record shows that the psychologist Robertson did testify as to his tests which were performed eleven months after the stabbing and that Dr. Solon was permitted to testify as to his treatment of defendant which ended thirteen months prior to the stabbing. It is true that due to constant bickering between the trial judge and defendant's counsel unfortunate comments were made. They resulted primarily from defendant's counsel's insistence on pursuing his theories even after the court ruled adversely. He was able, nevertheless, to present to the jury a full picture of the relationship between the defendant and his ex-wife and of the mental state of the defendant both prior to and after the stabbing. The defendant did not introduce any direct evidence that he was insane at the time of the commission of the crime. All of his psychiatric evidence was concerned with defendant's mental state either some time before or some time after the crucial date, whereas the State was able to introduce testimony of several police

officers that defendant seemed sane shortly after the commission of the crime. We thus find that defendant was not prevented by prejudicial errors from presenting his insanity defense.

 (3) Defendant next argues that he was denied a fair trial because of the improper rulings of the trial judge and because of the improper remarks and argument of the State's Attorney. Defendant alleges that the judge acted improperly when Father Grace refused to answer questions relating to conversations between the witness and the defendant. Although the judge did not rule specifically on the pastoral privilege objection, the result of his ruling was that the clergyman did not have to answer those questions. This result was proper since a clergyman cannot be compelled to disclose in any court any "confession or admission made to him in his professional character or as a spiritual advisor in the course of the discipline enjoined by the rules or practices of such religious body or of the religion which he professes, nor be compelled to divulge any information which has been obtained by him in such professional character or as such spiritual advisor." Ill Rev Stats 1963, c 51, § 48.1.

 At the close of the examination of Dr. Solon, the judge refused to allow in evidence the hospital records of defendant's fifteen-day stay in the hospital. The exclusion was improper because the doctor used these records to show the mental state of the defendant at that time and such mental state is relevant to the insanity defense. People v. Carpenter, 11 Ill2d 60, 142 NE2d 11. However, the doctor testified in some detail as to defendant's hospital stay and we do not believe the exclusion of the hospital records was prejudicial.

The defendant also alleges that the judge applied different rules of evidence for the State and the defense. It is alleged that the judge allowed testimony on the ultimate question of defendant's sanity by some policemen

but did not allow the psychologist to testify on that ultimate issue. The judge was correct in his handling of the matter. First, the policemen testified as to their opinion of the defendant's condition on the night of the homicide based on their observations of the defendant shortly after he killed the deceased. Secondly, Mr. Robertson, the psychologist, did not see defendant until eleven months afterward. The defense never put nor attempted to put to the psychologist any questions concerning the sanity of the defendant on the night of the crime.

Defendant also argues that there were improper remarks by the State's Attorney which prejudiced defendant. Defendant argues that the State's Attorney made a prejudicial misstatement of the testimony of the psychiatrist to the effect that the defendant was neurotic when the psychiatrist had actually said that the defendant was a schizoid personality with a paranoid reaction. However, it is well established that the jury is the arbiter of what testimony is given and that unintentional misstatements are not reversible error. Further, the defense did not object to this misstatement. Defendant also alleges that he was prejudiced by the State's Attorney's allusions to the burden of proving insanity being on the defendant. There is some language used by the State's Attorney which could be so construed, but it was never objected to and the trial judge gave the proper instructions on the subject to the jury thereby overcoming any conceivable prejudice.

Defendant's sole defense was insanity at the time of the commission of the crime. The Criminal Code of 1961 sets out the requirements for the defense of insanity as follows:

> (a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminal-

ity of his conduct or to conform his conduct to the requirements of law.

We believe that the jury could properly find from the evidence beyond a reasonable doubt that defendant did not have a "mental disease or mental defect" within the meaning of the Act * and that the statement of the defendant and the testimony regarding his actions immediately following the stabbing effectively rebutted any claim of insanity at the time of the crime. People v. Miller, 33 Ill2d 439, 211 NE2d 708.

The judgment is affirmed.

Affirmed.

ENGLISH and McNAMARA, JJ., concur.

---

* See Committee Comments to section 6–2(b) Ill Rev Stats 1961, c 38.