**Michelle SCOTT, Plaintiff,**

v.

**Steven LeRoy HAMMOCK, Defendant.**

**The Church of Jesus Christ of Latter-day Saints, Intervenor.**

No. 910112.

Supreme Court of Utah.

March 4, 1994.

Ross C. Anderson, Linda M. Jones, Salt Lake City, for Michelle Scott.

Mary C. Corporon, Salt Lake City, for Steven LeRoy Hammock.

Oscar W. McConkie, Merrill F. Nelson, Von G. Keetch, Salt Lake City, for Church of Jesus Christ of Latter-day Saints.

STEWART, Associate Chief Justice:

■ The United States District Court for the District of Utah certified to this Court the following question of law: "Whether nonpenitential communications between a lay person and a clergyman are privileged under Utah law." We accepted the certification pursuant to Utah Code Ann. § 78–2–2(1) (1992 & Supp.1993). We hold that nonpenitential communications are privileged under Utah law if they are intended to be confidential and are made for the purpose of seeking spiritual counseling, guidance, or advice from a cleric acting in his or her professional role and pursuant to the discipline of his or her church.

Michelle Scott filed a complaint in federal district court against her adoptive father, Steven Hammock, alleging that he had intentionally and recklessly inflicted emotional and psychological distress on her by physically and sexually abusing her for a period of more than ten years beginning in 1972 when she was five years old. In 1983, prior to the filing of the civil complaint, Steven Hammock was charged criminally with four counts of forcible sexual abuse against Scott and her sister. Hammock pleaded guilty to two counts of attempted forcible sexual abuse. He was subsequently excommunicated from the Church of Jesus Christ of Latter-day Saints (LDS Church).

While the criminal charges were pending, Hammock had three conversations with his bishop.[1] One took place in the bishop's church office with no one else present. The other two conversations took place in Hammock's home. Hammock's wife was present during one of the communications. When Scott took Hammock's deposition in the civil suit, Hammock invoked the clergy-penitent privilege and refused to disclose the substance of his communications with the bishop, except to say that the communications were not made in the context of his confessing or seeking forgiveness. The record is therefore clear that his communications to the bishop were not "penitential."

After Hammock invoked the clergy-penitent privilege, Scott subpoenaed documents from the LDS Church relating to Hammock's excommunication proceeding and communications referring to the abuse of Hammock's children. The Church moved to quash the subpoena on the ground that the information sought was privileged under the clergy-penitent privilege as stated in Utah Code Ann. § 78–24–8(3). Hammock then filed a motion for a protective order against the disclosure of the substance of his discussions with his bishop.

In granting the two motions, United States Magistrate Judge Ronald N. Boyce, in a lengthy and scholarly opinion on the scope of the Utah clergy-penitent privilege, held that the communications between Hammock and his bishop and the church documents relating to his excommunication proceeding were privileged under Utah Code Ann. § 78–24–8(3). *Scott v. Hammock*, 133 F.R.D. 610 (D.Utah 1990). Scott objected to the decision, and United States District Judge David A. Sam certified to this Court the question of whether nonpenitential communications to clergy are protected by the Utah clergy-penitent privilege from compelled disclosure in a legal proceeding.

When Scott filed her action, Rule 501 of the Utah Rules of Evidence, promulgated by this Court in 1983, provided that evidentiary privileges were governed "by the common law, except as modified by statute or court

---

1. In the LDS Church, a bishop is the ecclesiastical leader of a local congregation called a "ward." A group of wards make up a "stake," which is headed by a stake president. Bishops and stake presidents are ordained to their offices by those higher in the church hierarchy. A bishop's and stake president's duties include giving spiritual guidance and counsel to the members of the Church in their jurisdiction. They receive no formal educational training as clergymen, are not compensated by the Church, and perform their ecclesiastical duties in addition to their vocations.

rule." Section 78–24–8(3) was then in effect and therefore governs the scope of the clergy-penitent privilege issue in this case.[2] That provision states:

A clergyman or priest cannot, without the consent of the person making the confession, be examined as to any confession made to him in his professional character in the course of discipline enjoined by the church to which he belongs.

This provision was enacted in 1870 and since then has remained virtually unchanged. 1870 Acts, Resolutions, and Memorials, tit. 11, ch. 1, § 381; 1876 Compiled Laws, tit. 11, ch. 1, § 381.

Under the language of § 78–24–8(3), a communication is privileged if the communication (1) is a confession, (2) made to a clergyman or priest in his professional character, and (3) made in the course of discipline enjoined by the church to which the clergyman or priest belongs. The precise issue before us is whether a nonpenitential communication made to a cleric by a church member may be a "confession" as that term is used in § 78–24–8(3).

Scott argues that the statute must be strictly construed and that by definition the term "confession" means a penitential communication in which an admission of wrongdoing is made.[3] She points to LDS scripture

---

2. In 1971, this Court first promulgated rules of evidence. The 1971 rules included several evidentiary privileges. Rule 29 of those rules defined the clergy-penitent privilege:

(1) As used in this rule, (a) "priest" means a priest, clergyman, minister of the gospel or other officer of a church or of a religious denomination or organization, who in the course of its discipline or practice is authorized or accustomed to hear, and has a duty to keep secret, penitential communications made by members of his church, denomination or organization; (b) "penitent" means a member of a church or religious denomination or organization who has made a penitential communication to a priest thereof; (c) "penitential communication" means a confession of culpable conduct made secretly and in confidence by a penitent to a priest in the course of discipline or practice of the church or religious denomination or organization of which the penitent is a member.

(2) A person, whether or not a party, has a privilege to refuse to disclose, and to prevent a witness from disclosing a communication if he claims the privilege and the judge finds that (a) the communication was a penitential communication and (b) the witness is the penitent or the priest, and (c) the claimant is the penitent, or the priest making the claim on behalf of an absent penitent.

The issue of whether Rule 29 of the 1971 Utah Rules of Evidence superseded Utah Code Ann. § 78–24–8(3) has never been adjudicated and has not been addressed by the parties in this case. The 1971 rules were, however, superseded by rules of evidence promulgated by this Court in 1983. Rule 501 of those rules, as noted in the text, did not set out specific rules of privileged communications. On April 1, 1992, after this case arose, Rule 501 was superseded by specific rules establishing evidentiary privileges. The 1992 evidentiary rules were promulgated pursuant to this Court's constitutional rule-making power established by a 1984 amendment to Article VIII of the Utah Constitution. Rule 503 defines the clergy-penitent privilege as follows:

Communications to clergy.

(a) *Definitions.* As used in this rule:

(1) A "cleric" is a minister, priest, rabbi, or other similar functionary of a religious organization or an individual reasonably believed so to be by the person consulting that individual.

(2) A communication is "confidential" if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.

(b) *General rule of privilege.* A person has a privilege to refuse to disclose and to prevent another from disclosing any confidential communication to a cleric in the cleric's religious capacity and necessary and proper to enable the cleric to discharge the functions of the cleric's office according to the usual course of practice or discipline.

Although Scott's cause of action arose prior to the adoption of Rule 503, it is arguable that Rule 503 should govern this case. Because the question certified to this Court by the United States District Court asks for an interpretation of Utah Code Ann. § 78–24–8(3), we address that provision only.

3. Scott argues that the privilege statute must be strictly construed and limited to its narrowest possible application. Although there is authority to that effect, that rule is subject to the overriding rule that a statute should be construed "in accordance with its object" or purpose, *Jackson v. Kennecott Copper Corp.*, 27 Utah 2d 310, 315, 495 P.2d 1254, 1257 (1972), and given the scope that is "necessary to achieve its purpose." *Gold Standard, Inc. v. American Barrick Resources Corp.*, 801 P.2d 909, 911 (Utah 1990). On that principle, this Court has not given privilege statutes the narrowest possible construction but has construed them to effectuate the legislative purpose. *See, e.g., Hofmann v. Conder*, 712 P.2d 216 (Utah 1985); *Berry v. Moench*, 8 Utah 2d 191,

to establish that confession of sin is an important principle in LDS doctrine and asserts that because the communications Hammock had with his bishop were not penitential, they were not confessions and therefore not privileged.

The LDS Church and Hammock argue that a broader construction is necessary to avoid discriminating against religious denominations that do not require formal confessions, but whose doctrine and practice require their clerics to provide confidential spiritual counseling, guidance, and advice to their parishioners. The LDS Church points out that many religious denominations, including a number of Protestant churches, teach that admission of wrongdoing is an important part of their religious doctrine and practice, but have no formal requirement for making admissions of wrongdoing to a cleric. In addition, the LDS Church argues that whether or not formal penitential confessions are required by a denomination, the role of a cleric in providing spiritual guidance and counseling cannot properly be limited to formal confessions and the law ought to recognize that fact. With respect to its own doctrine and practice, the LDS Church states that its members are required to engage in a process of repentance by which confidential admissions of wrongdoing may be made to a bishop or stake president at the beginning, during, or at the end of the repentance process and that confidential nonpenitential communications between a bishop or stake president and members of the LDS Church are an essential part of that process. Indeed, the LDS Church asserts that according to its course of discipline, it is impossible to separate a specific "penitential confession" from the process of providing religious and spiritual counseling, guidance, and admonishment intended to persuade a church member to forsake and make amends for wrongful conduct.

■ The term "confession" in § 78–24–8(3) is not defined by the statute. Scott seems to argue that the term "confession" means a formal, specific type of religious practice, such as occurs in the Catholic Church. Such a restricted meaning is not required by the statute. In common parlance, the word "confess" is used in several ways. It may mean simply "to disclose or acknowledge (something damaging or inconvenient to oneself)." *The American Heritage Dictionary of the English Language* 279 (1980).

■ The term "confession" also takes meaning from the remainder of the language used in the statute. In that context, a "confession" must be made to a "clergyman or priest," according to and "in the course of discipline enjoined by the church to which he belongs." Thus, the term "confession" as used in the statute does not take its meaning from the course of discipline of any one church, but rather depends for its meaning on the course of discipline of the church of the cleric. We note that use of the term "clergyman" in the statute, in addition to the more specific term "priest," is consistent with the conclusion that the term "confession" should be construed in light of the particular doctrine or discipline of the church to which the cleric belongs. *See In re Swenson,* 183 Minn. 602, 237 N.W. 589, 591 (1931).

The historical development of the clergy-penitent privilege in this country also sheds light on how the statute should be construed. Under old English common law, the confidentiality of the confessional was observed and protected in the courts at least until the Reformation. *See* 8 J. Wigmore, *Wigmore on Evidence* § 2394, at 869 (McNaughten rev. 1961); Jacob M. Yellin, *The History and Current Status of the Clergy–Penitent Privilege,* 23 Santa Clara L.Rev. 95, 100–01 (1983) [hereinafter Yellin]. There is also some evidence that the privilege continued to be applied after the Reformation, although the point is disputed. *Compare Mullen v. United States,* 263 F.2d 275, 278 (D.C.Cir.1958) (Fahy, J., concurring, joined by Edgerton, J.) *with* 8 J. Wigmore, § 2394, at 869.

In any event, it is generally thought that the privilege first formally appeared in American law in 1813 in the unpublished New York case of *People v. Phillips, abstracted in* 1 Western L.J. 109 (1843), and *reported in Privileged Communications to*

331 P.2d 814 (1958). *Contra State v. Gotfrey,* 598 P.2d 1325, 1327–28 (Utah 1979).

*Clergymen,* 1 Cath.Law. 199 (1955) [hereinafter *Privileged Communications* ], and *cited in* Yellin, at 104 n. 49. In *Phillips,* the New York Court of General Sessions refused to compel a Catholic priest to testify concerning a defendant's confession made to him during the administration of the Sacrament of Penance on the ground that the priest was bound by the canons of his church to maintain silence. *Privileged Communications,* at 207. The court based its ruling, not on common law or historical grounds, but on the principle that compelling a priest to breach the confidentiality of the confessional would violate the constitutional right to the free exercise of religion. *Id.; see also* Yellin, at 105.

Four years after *Phillips* was decided, another New York court, in *People v. Smith,* 2 City Hall Recorder (Rogers) 77 (N.Y. 1817), *reported in Privileged Communications,* at 209–213, held that a confession to a non-Catholic clergyman was not privileged because "auricular confessions were not required in the course of discipline prescribed by the canons of his church." Annotation, *Matters to Which the Privilege Covering Communications to Clergyman or Spiritual Adviser Extends,* 71 A.L.R.3d 794, 798 (1976).

The *Phillips* and *Smith* cases apparently prompted the New York Legislature to pass the nation's first clergy-penitent privilege law, which read:

> No minister of the gospel, or priest of any denomination whatsoever, shall be allowed to disclose any confessions made to him in his professional character, in the course of discipline enjoined by the rules of practice of such denomination.

Rev.Stat. of N.Y., tit. 3, § 72 (1829), *quoted in* Seward Reese, *Confidential Communications to the Clergy,* 24 Ohio St.L.J. 55, 57 (1963). This language established an evidentiary privilege for confessions made to all priests and ministers "of the gospel," if made pursuant to "the rules of practice of such denomination." *See generally* Yellin; Michael J. Callahan, *Historical Inquiry into the Priest–Penitent Privilege,* 36 The Jurist 328 (1976).

Subsequent to New York's enactment of the privilege in 1828, forty-six states and the District of Columbia enacted clergy-penitent privileges. Yellin, at 108. A number of these were patterned after the New York statute. *Id.* Indeed, the statute enacted by the Utah Territorial Legislature in 1870 was apparently modeled after the privilege adopted by New York. *See* Fred L. Kuhlmann, *Communications to Clergymen— When Are They Privileged?,* 2 Val.U.L.Rev. 265, 267–68 (1968). For the most part, the Utah statute is similar to statutes in other states, although there are variations in wording.

Although there is authority to support Scott's argument that the word "confession" should be narrowly construed, *see, e.g., Johnson v. Commonwealth,* 310 Ky. 557, 221 S.W.2d 87, 89 (1949); *Radecki v. Schuckardt,* 50 Ohio App.2d 92, 4 O.O.3d 60, 361 N.E.2d 543, 546 (1976); Annotation, *Matters to Which the Privilege Covering Communications to Clergyman or Spiritual Adviser Extends,* 71 A.L.R.3d 794, 807–08 (1976), a constricted interpretation of the privilege does not take into account the essential role that clergy in most churches perform in providing confidential counsel and advice to their communicants in helping them to abandon wrongful or harmful conduct, adopt higher standards of conduct, and reconcile themselves with others and God. Indeed, even when confession is part of an essential sacrament, as in the Catholic Church, *see The Catholic Encyclopedia* 58, 130, 466–67 (R. Broderick ed. 1987), clergy must still give confidential guidance concerning the moral faults of their parishioners pursuant to their responsibility to give spiritual and religious advice, counsel, and admonishment. In counseling parishioners in religious and moral matters, clergy frequently must deal with intensely private concerns, and parishioners may be encouraged, and even feel compelled, to discuss their moral faults. As one commentator has stated, "Because most churches do not set aside formal occasions for special private encounters labeled 'confession,' less formal consultation must be privileged if the privilege is not in effect to be limited to Roman Catholics." Mary Harter Mitchell, *Must Clergy Tell?,* 71 Minn.L.Rev. 723, 748 (1987) (footnotes omitted).

In discharging their responsibilities to communicants under church doctrine and practice generally, clergy must deal on occasion with a variety of confidential communications. Professor Mitchell explained the nature of the problem with respect to counseling communicants:

[T]he content of counseling sessions often includes many theoretically distinguishable types of confidential disclosure, including, for example, statements of the confider's past conduct, confessions, expressions of penitence, expressions of anger and other deeply felt emotions, solicitations of advice, personal background information, and statements about the wrongdoing of others.

... A typical counseling session will be an unpredictable, often emotional, welter of several types of communication. It is practically impossible to untangle the various strands of communication and make only some privileged. Even if some distinctions could be drawn, there are at least two reasons for the law not to draw its distinctions too finely. First, the same information may be included in several intermingled types of communication. It makes little sense, for example, to shield a person's confession of a sinful act but to unveil the subsequent discussion of how the penitent might redress his wrongs. Second, even if a counseling session could be severalized by type of communication, no good reason supports holding some types privileged and others not. No rationale for the clergy privilege is limited to penitential statements only.

*Id.* at 748–49 (footnotes omitted).

A broad construction of the statute is also consistent with case law from other states. In *Kruglikov v. Kruglikov*, 29 Misc.2d 17, 217 N.Y.S.2d 845, 847 (N.Y.Sup.Ct.1961), the New York Supreme Court held that a rabbi could not be compelled to testify regarding marriage counseling sessions conducted with a husband and wife prior to their divorce proceedings, even though the sessions were for the purpose of "counseling." The party seeking disclosure contended that the scope of the privilege did not extend to counseling, that the rabbi was not the Kruglikovs' direct

ecclesiastical leader, and that it was the rabbi—not the Kruglikovs—who initiated the counseling session to try to reconcile the parties. *Id.* at 846–47. The court acknowledged that the parties had not initiated their discussions with the rabbi for the purpose of "confessing" and implicitly recognized that the communications had nothing to do with seeking forgiveness for sin. Nevertheless, the court stated:

The court is of the opinion that it matters not how and by whom the meeting was initiated.... The fact is that they consulted a representative of their faith in the privacy of his study in the Synagogue with a view to reconciliation and restoring their marriage. It cannot be supposed that either husband or wife, or both, would have been willing to disclose their marital problems to the Rabbi if they thought that what they said would ever be divulged, even in a judicial proceeding.... [W]hat was said by the parties here, in the privacy of the Rabbi's study, was stamped with the seal of confidence which the parties in such a situation would feel no occasion to exact. If the privilege conferred by section 351 of the Civil Practice Act is not to be stultified, confidential communications to a clergyman under the circumstances here involved must be deemed to fall within the spirit of this statute....

*Id.; see also Snyder v. Poplett*, 98 Ill.App.3d 359, 53 Ill.Dec. 761, 764, 765, 424 N.E.2d 396, 399, 400 (1981) (communications between clergymen and laymen originating in confidence privileged); *People v. Pecora*, 107 Ill. App.2d 283, 246 N.E.2d 865, 873 (1969) (statements made in course of marriage counseling with pastor held privileged), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1274, 25 L.Ed.2d 538 (1970); *Pardie v. Pardie*, 158 N.W.2d 641, 645 (Iowa 1968) (statements made to minister regarding family problems privileged). *But see Johnson v. Commonwealth*, 310 Ky. 557, 221 S.W.2d 87, 89 (1949); *Radecki v. Schuckardt*, 50 Ohio App.2d 92, 4 O.O.3d 60, 361 N.E.2d 543, 546 (1976).

■ We conclude that the term "confession" need not be construed to apply only to penitential communications and that a broad construction of that term is necessary to take

into account the essential religious role clergy play in dealing with the wrongdoing of parishioners.

Constitutional considerations buttress our conclusion. As observed above, *Phillips* acknowledged that the constitutional right to the free exercise of religion strongly suggests that the privilege should be recognized when clergy perform the functions required of them. The *Phillips* court noted that in view of the free exercise clause of the New York Constitution, "[i]t is essential to the free exercise of a religion, that its ordinances should be administered—that its ceremonies as well as its essentials should be protected." *Privileged Communications,* 1 Cath.Law. 199, 207 (1955). More recent cases take the same position with respect to the First Amendment to the United States Constitution. *See Mullen v. United States,* 263 F.2d 275, 280 (D.C.Cir.1958) (Fahy, J., concurring, joined by Edgerton, J.) (sound policy concedes to religious liberty the rule that secrets acquired in performance of spiritual function should not be disclosed in judicial proceeding); *Griffin v. Coughlin,* 743 F.Supp. 1006, 1028 (N.D.N.Y.1990) (free exercise clause recognizes need for privacy in confidential communications with spiritual advisor); *Cimijotti v. Paulsen,* 230 F.Supp. 39, 41 (N.D.Iowa 1964) (compelled disclosure of statements made in recognized and required church proceeding would violate First Amendment free exercise of religion clause), *aff'd,* 340 F.2d 613 (8th Cir.1965) (per curiam).

We agree with Magistrate Boyce, who, in the prior proceeding in this case, observed that a narrow construction of the statute would raise serious questions under Article I, section 4 of the Utah Declaration of Rights, which provides for freedom of conscience and religion: "The term confession, if narrowly read, would exclude acknowledgements that were made in the course of solicitation of religious counseling and advice. This would exclude from protection a significant amount of religious confidences that many religions in Utah would deem an important part of the discipline of their faith." *Scott v. Hammock,* 133 F.R.D. 610, 618 (D.Utah 1990).

Reading the privilege statute narrowly would create the risk that the law would be discriminatorily applied against religious practices of churches on the basis of theological differences as to how reconciliation with God is to be achieved. It would not be appropriate for a court to be asked to accord greater verity or importance to one denomination's sacraments, practices, or disciplines over those of another.

A broad construction of the clergy-penitent privilege is also consistent with the purpose of its secular analogue, the psychotherapist-patient privilege. From a policy point of view, both serve similar ends. In *State v. Gotfrey,* 598 P.2d 1325 (Utah 1979), a concurring and dissenting opinion noted the similarity of psychotherapist-patient and clergy-penitent privileges with respect to benefits they confer on society:

> The policy underlying that [psychologist's] privilege is rooted in the belief that individuals and society at large may be greatly benefitted by fostering a sound therapeutic relationship in the interest of preserving families, enhancing individual development and growth, and allowing persons to deal with problems which might otherwise erupt into serious individual and societal difficulties. . . . The beneficial effects that may emerge from a therapeutic relationship cannot be fully achieved, and perhaps cannot be achieved at all, unless there is a trusting relationship between a psychologist and patient which is founded on a sense of complete confidentiality. Only on that basis are most persons willing to open up their innermost personalities and disclose the most private and sometimes painful aspects of their inner selves. At least in some measure, the privilege in question is supported by consideration similar to those that support the priest-penitent privilege.

*Id.* at 1329 (Stewart, J., concurring in part and dissenting in part). In a similar vein, the court in *Mullen v. United States,* 263 F.2d 275 (D.C.Cir.1958), stated:

> The benefit of preserving these confidences inviolate overbalances the possible benefit of permitting litigation to prosper at the expense of the tranquility of the home, the

integrity of the professional relationship, and the spiritual rehabilitation of the penitent. The rules of evidence have always been concerned not only with truth but with the manner of its ascertainment.

*Id.* at 280; *see also Cimijotti v. Paulsen,* 230 F.Supp. 39 (N.D.Iowa 1964), *aff'd,* 340 F.2d 613 (8th Cir.1965) (per curiam).

The clergy-penitent relationship depends on a sense of complete confidentiality as much as the psychotherapist-patient privilege does. At least to some extent, admissions of wrongdoing to clerics and psychotherapists would not be made but for the belief of parishioners and patients that their confidences would not be disclosed. It is only "on that basis that ... most persons [are] willing to open up their innermost personalities and disclose their most private and sometimes painful aspects of their inner selves." *Gotfrey,* 598 P.2d at 1329 (Stewart, J., concurring in part and dissenting in part). Thus, to fulfill their responsibilities, clergy must be able to counsel and admonish with confidentiality if they are to "show the transgressor the error of his way; to teach him the right way; to point the way to faith, hope, and consolation [and] perchance to lead him to seek atonement." *In re Swenson,* 183 Minn. 602, 237 N.W. 589, 591 (1931).

■ Not all communications to a cleric from a parishioner, however, are privileged. Section 78–24–8(3) contains two important restrictions: The communication must be made (1) to the cleric in his or her professional character and (2) in the course of the discipline enjoined by the church to which the cleric belongs.[4] Communications with a cleric that fail either of these requirements are not privileged, even though they might fall within the definition of a confession. In

addition, the communication must have been confidential. *See People v. Police,* 651 P.2d 430, 431 (Colo.Ct.App.1982).

■ Whether communications between a cleric and a parishioner are confidential may depend on the facts and circumstances surrounding the communications, such as whether the situs of the communication indicates an intent that the communication be confidential, whether the conversation was casual in nature or undertaken by the cleric and the parishioner with a sense that the parishioner's moral conduct was at issue, and whether persons not concerned with the subject matter were present. A communication that does not take place in private or that is made in the presence of others not intimately and directly concerned with the issue may indicate that the parties involved did not intend the conversation to be confidential.

In *People v. Police,* 651 P.2d 430 (Colo.Ct. App.1982), the defendant confessed to a minister who was also the father of the victim. In holding the privilege inapplicable, the court noted, "Nothing in the entire conversation indicated that defendant expected any confidentiality or that he was seeking the confidence of the [minister]." *Id.* at 430. The court ruled that although a confession was made, the statements were not made to the minister in his professional capacity in the course of discipline enjoined by his church and therefore were not privileged.

■ Likewise, statements made to a cleric in a social context are not privileged because the statements are not made to the cleric in the course of his or her professional responsibilities or in a religious context. *See Angleton v. Angleton,* 84 Idaho 184, 193, 370 P.2d 788, 797 (1962); *In re Estate of Soeder,* 7

4. *In re Swenson,* 183 Minn. 602, 237 N.W. 589, 591 (1931), defined course of discipline as follows:

The statute has a direct reference to the church's "discipline" of and for the clergyman and as to his duties as enjoined by its rules or practice. It is a matter of common knowledge, and we take judicial notice of the fact, that such "discipline" is traditionally enjoined upon all clergymen by the practice of their respective churches. Under such "discipline" enjoined by such practice all faithful clergymen render such help to the spiritually sick and

cheerfully offer consolation to suppliants who come in response to the call of conscience. The courts also take judicial notice of the numerous sects and the general doctrine maintained by each.

It is important that the communication be made in such spirit and within the course of "discipline," and it is sufficient whether such "discipline" enjoins the clergyman to receive the communication or whether it enjoins the other party, if a member of the church, to deliver the communication.

(Citations omitted.)

Ohio App.2d 271, 36 O.O.2d 404, 220 N.E.2d 547, 566–573 (1966).

 In sum, the statute does not require that communications to clergy by a communicant be penitential to be privileged, but it does require that they be made in confidence and for the purpose of seeking or receiving religious guidance, admonishment, or advice and that the cleric was acting in his or her religious role pursuant to the practice and discipline of the church.[5]

The LDS Church states that according to its doctrine and practice, confession is part of a repentance process that may be initiated either by a member or by a bishop or stake president. Members may volunteer a confession to a bishop or stake president, or an admission of wrongdoing may follow counseling, guidance, and admonishment by a bishop or stake president. In either event, confession, as such, is only part of the religious process of repentance whereby one may be absolved from sin. The LDS Church states in its brief, "In the course of the Church's discipline, full confession often occurs over a substantial period of time during counseling and guidance sessions; sometimes it does not take place until after the member has been excommunicated." According to LDS doctrine and practice, a confession may therefore be a single communication by a member to a bishop or stake president or part of an interactive process between a bishop or stake president and a member that is intended to lead the wrongdoer to a full appreciation of, and ultimately atonement for, the wrong committed.

 The circumstances of the instant case indicate that the communications between Hammock and his bishop concerned an issue pertaining to Hammock's moral conduct and that the bishop was acting in his role as cleric. The communications were intended to be confidential. The first meeting took place privately in the bishop's church office. Even though the other two conversations took place in Hammock's home, they were private and apparently requested by the bishop.[6] Whether Hammock acknowledged wrongdoing or sought forgiveness is not determinative because the bishop communicated with Hammock in the bishop's clerical role with regard to spiritual or religious matters.

We do not reach the issue of whether the documents relating to Hammock's excommunication proceeding are privileged, as it was neither briefed nor argued.

ZIMMERMAN, C.J., and HOWE and DURHAM, JJ., concur.

HALL, J., sat on this case but retired before he could act.

---

5. A cleric may be required under the canons and ethical obligations of his or her church to keep communications confidential even though they do not fall within the confines of the privilege. While our holding limits the application of the privilege to certain communications, it is not meant to be a comment on those ethical obligations. The clergy privilege is merely a rule of evidence that protects certain communications from public disclosure during litigation; it does not define a cleric's ethical obligations within his or her own religion. Thus, the privilege may or may not be coextensive with a cleric's spiritual and professional responsibilities with respect to confidences.

6. We do not address the effect of the presence of Hammock's wife on the existence of the privilege because it was neither raised nor briefed by the parties. *See Scott v. Hammock*, 133 F.R.D. 610, 619 n. 15 (D.Utah 1990). We note, however, that her presence does not necessarily bar application of the privilege. Often religious advice and counseling may be sought by spouses who have a concern about the conduct of one of them.