# IN RE CONTEMPT OF EMIL SWENSON.[1]

June 26, 1931.

No. 28,545.

*Walter S. Lundeen,* for relator.

*Henry N. Benson,* Attorney General, *James E. Markham,* Deputy Attorney General, and *John F. Bonner,* Assistant Attorney General, for respondent.

*Paul J. Thompson* and *Thompson, Hessian & Fletcher,* filed a brief by permission of the court on behalf of the Minneapolis Church Federation.

WILSON, C. J.

Certiorari to review an order of the district court adjudging relator in contempt of court for refusing to answer certain questions while a witness in an action wherein Gladys V. Sundseth

[1]Reported in 237 N. W. 589.

sought a divorce from her husband, Arnold C. Sundseth, on the ground of adultery.

Relator is a clergyman in the Lutheran church and pastor of the Bethlehem Lutheran Church in Minneapolis. In the divorce suit plaintiff sought to prove by relator that the defendant therein stated to relator that he, the defendant, had had adulterous relations with a woman whom he named. Relator's refusal to testify is based upon the claim that such statements as Sundseth made to him were made to him as such clergyman, and it is claimed that the communications were privileged.

Under the common law communications made to a minister of the gospel were not privileged. Some judges have expressed the belief that while the information could not legally be withheld from a court of law, the disclosure of such information ought not to be compelled. Since about 1846 the courts have manifested a reluctance to enforce the common law rule, with which we are now concerned. But it is definitely established that the common law did not recognize such privilege. 5 Jones, Ev. (2 ed.) p. 4152, § 2181; 5 Wigmore, Ev. (2 ed.) § 2394; 28 R. C. L. p. 520, § 108; L. R. A. 1917D, 278, Anno; Normanshaw v. Normanshaw, 69 L. T. Rep. 468; Bahrey v. Poniatishin, 95 N. J. L. 128, 112 A. 481; Best, Ev. (12 ed.) p. 499, § 583, et seq; 6 N. C. L. Rev. 462.

G. S. 1923 (2 Mason, 1927) § 9814(3) relating to privileged communications, reads:

"A clergyman or other minister of any religion shall not, without the consent of the party making the confession, be allowed to disclose a confession made to him in his professional character, in the course of discipline enjoined by the rules or practice of the religious body to which he belongs."

Obviously the legislature was not satisfied with the common law rule. What then was the purpose in passing the statute? If we are to construe this statute as meaning that the only "confession" that is privileged is the compulsory one under the rules of the particular church, it would be applicable only, if our information is

correct, to the priest of the Roman Catholic church. Certainly the legislature never intended the absurdity of having the protection extend to the clergy of but one church. Had the legislature intended so to limit the privilege, the word "priest" would probably have been used instead of "clergyman." But the statute says "clergyman or other minister of any religion," showing that the thought was to embrace the spiritual adviser of any religion, whether he be termed priest, rabbi, clergyman, minister of the gospel, or any other official designation. It includes anyone who may stand as a spiritual representative of his church. The statute also refers to the "rules or practice of the religious body to which he (the clergyman) belongs." Obviously the language of the statute forbids its limitation to the spiritual adviser of any one church.

We are of the opinion that the "confession" contemplated by the statute has reference to a penitential acknowledgment to a clergyman of actual or supposed wrongdoing while seeking religious or spiritual advice, aid, or comfort; and that it applies to a voluntary "confession" as well as to one made under a mandate of the church. The clergyman's door should always be open; he should hear all who come regardless of their church affiliation.

The word "discipline" has various meanings. It may relate to education. It involves training and culture. It may mean training in moral rectitude, and it was probably in part so used here. It may refer to rules and duties. The word has no technical, legal meaning and in its common and most general sense signifies instruction, comprehending the communication of knowledge and training, to observe and act in accordance with certain rules or practice, and may include correction. Stitt v. Locomotive Engineers M. P. Assn. 177 Mich. 207, 142 N. W. 1110. The "discipline enjoined" includes the "practice" of all clergymen to be trained so as to advance such "discipline," to be alert and efficient in submission to duty, to concern themselves in the moral training of others, to be as willing to give spiritual aid, advice or comfort as others are to receive it, and to be keenly concerned in reformatory methods of correction leading towards spiritual confidence. So it is in the

course of "discipline enjoined" by the "practice" of their respective churches that the clergyman is to show the transgressor the error of his way; to teach him the right way; to point the way to faith, hope, and consolation; perchance, to lead him to seek atonement.

The statute has a direct reference to the church's "discipline" of and for the clergyman and as to his duties as enjoined by its rules or practice. It is a matter of common knowledge, and we take judicial notice of the fact, that such "discipline" is traditionally enjoined upon all clergymen by the practice of their respective churches. Under such "discipline" enjoined by such practice all faithful clergymen render such help to the spiritually sick and cheerfully offer consolation to suppliants who come in response to the call of conscience. The courts also take judicial notice of the numerous sects and the general doctrine maintained by each. State ex rel. Weiss v. Dist. Bd. of School Dist. No. 8, 76 Wis. 177, 44 N. W. 967, 7 L. R. A. 330, 20 A. S. R. 41.

It is important that the communication be made in such spirit and within the course of "discipline"; and it is sufficient, whether such "discipline" enjoins the clergyman to receive the communication or whether it enjoins the other party, if a member of the church, to deliver the communication. Such practice makes the communication privileged, when accompanied by the essential characteristics, though made by a person not a member of the particular church or of any church. Man, regardless of his religious affiliation, whose conscience is shrunken and whose soul is puny, enters the clergyman's door in despair and gloom; he there finds consolation and hope. It is said that God through the clergy resuscitates. The clergymen practice the thought that "the finest of all altars is the soul of any unhappy man who is consoled and thanks God."

To be privileged the communication must be made to the clergyman as such and by a person seeking religious or spiritual advice, aid, or comfort. It must be in confidence of the relation and under such circumstances as to imply that the information should forever remain a secret in the breast of the confidential adviser. It must also be penitential in character. If so, it is the duty of the clergy-

man to hear and advise, because such is in the course of "discipline" so enjoined by the practice of all churches. The fundamental thought is that one may safely consult his spiritual adviser. For obvious reasons of public policy, the clergyman (and doctor) is given (by statute) the same privilege as the lawyer had at common law. Mr. Justice Evans in Reutkemeier v. Nolte, 179 Iowa, 342, 350, 161 N. W. 290, 293, L. R. A. 1917D, 273, in discussing a statute of this character said:

"The purpose of the statute is one of large public policy. We are told of one in an olden time who 'found no place of repentance, though he sought it carefully with tears.' This statute is based in part upon the idea that the human being does sometimes have need of a place of penitence and confession and spiritual discipline. When any person enters that secret chamber, this statute closes the door upon him, and civil authority turns away its ear."

The question is not the truth or merits of the religious persuasion to which a party belongs nor whether the particular creed or denomination exacts, requires, or permits a sacred communication; but the sole question is, as suggested in Best, Ev. (12 ed.) § 585, whether the party who bona fide seeks spiritual advice should be allowed it freely.

Relator had performed the marriage ceremony for the Sundseths, and both had been members of his church. Mr. Sundseth was a trustee therein. Mr. Sundseth telephoned the relator asking permission to see and talk with him. The request was granted, and he came immediately. He called at relator's home and was received in the sitting room, wherein others were present. Relator took a seat, and Mr. Sundseth said: "I want to see you in your private office." In order that the conversation might be secret and not heard by any member of the relator's family, the two went to the relator's study on the second floor, and there behind closed doors Mr. Sundseth said to relator: "I have something that I want to tell you, and under the circumstances it is very hard for me to face my pastor," and relator says that Sundseth "then broke

down in tears." The talk was confidential in origin and penitential in character. Relator's conduct was in the line of duty. He testified that Sundseth then discussed his intimate affairs with him. In the divorce trial he refused to disclose what Sundseth there said to him.

We are of the opinion that the disclosed facts and circumstances established the fact that Sundseth sought spiritual aid, consolation, or advice; that he talked to relator in his professional character as a clergyman; that the communication was penitential in character and was received in confidence by relator in the course of discipline enjoined upon him by the practice of his church; that any statement so made in the nature of an admission relative to the subject matter of the then pending trouble was a confession made to relator in his professional character in the course of discipline enjoined by the practice of his church; and that such statement was privileged and relator was not at liberty to disclose it.

It will not do to require the witness to disclose the communication to enable the court to determine whether it is privileged. That would be tragical. The witness may be subjected to such preliminary interrogation as may be necessary. The court must look to the circumstances and facts leading up to the making of the communication as sufficiently characterizing the transaction to indicate whether the rule of privilege is applicable. Before directing the witness to answer, the court should be satisfied that the witness is mistaken in making the claim of privilege. The ultimate decision on the claim of privilege must be made by the court. That is a judicial function. It is the duty of the court to protect the privilege, and there is little danger of the witness, under the claim of privilege, screening others from justice.

L. 1931, p. 232, c. 206, amending our statute, has become a law since this case has arisen and is without application.

The order adjudging the relator in contempt of court is reversed.