**STATE of Minnesota, Respondent,**

v.

**Alan Rami ORFI, Appellant.**

**No. C0–93–645.**

Court of Appeals of Minnesota.

Jan. 25, 1994.

Review Denied March 15, 1994.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Alan L. Mitchell, St. Louis County Atty., Gary W. Bjorklund, Asst. County Atty., Duluth, for respondent.

John M. Stuart, State Public Defender, Lyonel Norris, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by NORTON, P.J., and HUSPENI and FLEMING,* JJ.

## OPINION

HUSPENI, Judge.

Convicted on three counts of second degree murder and acquitted on one first de-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-    pointment pursuant to Minn. Const. art. VI, § 10.

gree murder count, appellant claims that the trial court erred in admitting the testimony of two members of the clergy. We agree, but hold that the error was harmless. Appellant also claims that his case was prejudiced by the state's destruction of evidence and challenges the admission of *Spreigl* evidence, the limitation of his direct examination of his medical expert, and the denial of his motion for change of venue. Because we find no error in the trial court's determination of these four issues, we affirm.

## FACTS

Alan Orfi carried 23–month–old Andrew White into a Duluth hospital emergency room at 12:20 a.m., March 14, 1991. Andrew was pale, was not breathing, and had no heartbeat. He had a bruise, or several overlapping bruises, on his forehead and bruises on his buttocks, the backs of his thighs, and behind his right ear.

The doctors diagnosed Andrew as failure-to-thrive due to malnutrition. He was thin and small, weighing just over nineteen pounds. His hair was thinning and "broken" in spots. Hospital personnel revived Andrew and placed him on an IV in intensive care.

Andrew's mother, Melodie White, was called from work and arrived while Andrew was in the emergency room. Adelia Ryan, the hospital's on-call chaplain, was also present in the emergency room. Chaplain Ryan met Orfi in the hallway and asked if he was there for the little boy. She identified herself as a chaplain and escorted Orfi to the hospital's family room where they spoke.

Another clergy member, Reverend Fredrick Lund, was called by the hospital to meet with Tina White, Melodie's mother. Lund, the pastor at a local baptist church, was also introduced to Orfi and Melodie. Reverend Lund later asked Orfi if he wanted to talk, and the two went to the hospital lounge/waiting area.

After Andrew's admission to the hospital, Orfi contacted an acquaintance about transportation to Texas, actually travelled to Cloquet, but then called the hospital and returned. By March 16th, it appeared Andrew would not live. On the 17th, Orfi apparently attempted suicide and was admitted for psychiatric care. Andrew died on March 19th.

Melodie and Orfi had met in Texas when Andrew was approximately two months old and moved to Duluth in October 1990. Orfi had been unable to find a job in Duluth in his field, psychology. He was unsuccessful at a lawn care business he had purchased and was frustrated and financially stressed.

Melodie had worked eleven straight days or nights at her nursing job prior to March 13. Orfi cared for Andrew during this time. On March 13th, Orfi and Melodie had an argument, and Orfi left the house. When he returned, the door was locked so he broke the window to get in. After mending the rift caused by the argument, Orfi, with Andrew in the car, drove Melodie to work at about 10:00 p.m. March 13. Orfi and Andrew then went grocery shopping.

Orfi testified that Andrew was lethargic and didn't eat much when they got home, that they watched television for a while, and then Andrew went rigid, arched his back, clenched his teeth, and lost consciousness. Orfi testified that he jostled Andrew but did not shake him hard and then went to the bedroom to call Melodie for help. Andrew roused for a minute, but again lost consciousness. Orfi rushed him to the hospital. Orfi testified that a heavy door that was off its hinges fell on Andrew approximately three days before his hospitalization, and that on the day following that mishap Andrew fell on the carpet and scraped his head. Orfi, who acknowledged that he occasionally spanked Andrew, stated that because his hand had left a bruise, he began using a plastic spatula because it was lighter. Orfi stated Andrew bruised easily.

The pathologist who performed the autopsy testified that Andrew was a battered child within the definition of the battered child syndrome. Doctors also testified that Andrew had been violently shaken. Orfi was convicted of three counts of murder in the second degree.

## ISSUES

1. Did the trial court err in determining that the testimony of Reverend Lund and

Chaplain Ryan was not privileged under Minn.Stat. § 595.02, subd. 1(c)?

2. Was limited testimony of Orfi's treatment of Orfi's son from a previous marriage properly admitted as *Spreigl* evidence?

3. Was there sufficient evidence of assault and malicious punishment of a child to sustain Orfi's second degree murder convictions?

4. Were Orfi's due process rights violated by loss or destruction of evidence?

5. Did the court properly exclude Orfi's doctor's testimony on the significance of seizure activity in making his diagnosis?

6. Did the trial court's refusal to change venue deny Orfi a fair trial?

## ANALYSIS

### I.

Communications with a clergy member or other religious minister are subject to the following testimonial privilege:

> A member of the clergy or other minister of any religion shall not * * * be examined as to any communication made to the * * * minister by any person seeking religious or spiritual advice, aid, or comfort or advice given thereon in the course of the * * * minister's professional character, without the consent of the person.

Minn.Stat. § 595.02, subd. 1(c) (1992).

■ In determining whether the privilege applies, the trial court should look to the circumstances leading up to the communication. *In re Swenson,* 183 Minn. 602, 606–07, 237 N.W. 589, 591 (1931) (privilege applied when, before speaking to his minister, a communicant asked that the conversation take place in the minister's private office, told the minister it was difficult to face him, and began to cry).

■ The purpose of the privilege is to allow individuals freedom to unburden themselves by seeking spiritual healing without the threat of incriminating themselves. *Id.* at 605–06, 237 N.W. at 591. The focus of the court's inquiry, therefore, must be on the intent of the communicant that the conversation be confidential. *Id.*

■ Assertion of the privilege requires proof of the following: (1) the potential witness is a religious minister; (2) the communicant intended the conversation to be private; and (3) the communicant was seeking religious or spiritual help. *State v. Lender,* 266 Minn. 561, 564, 124 N.W.2d 355, 358 (1963). We shall apply each of these factors to the circumstances of this case.

■ First, there is no doubt that both Lund and Ryan were ministers. Each identified themselves to Orfi as members of the clergy. Ryan was an employee of the hospital and performed some duties other than as a minister, but the hospital called upon her here as a minister. While Ryan performed duties such as checking the condition of Andrew and reporting back to Orfi, this is not inconsistent with a minister's role; her contact with Orfi evinced personal, rather than medical or administrative support.

■ Lund was likewise at the hospital in his ministerial role. Although Lund told Orfi before speaking with him that he was not there for a counseling session, Lund did state that he was there as a "supportive friend." This seems merely to have been a less intimidating way of offering his ministerial services.

■ Second, we conclude that Orfi's conversations with Ryan and Lund were intended to be confidential. After Orfi met Ryan in the hospital hallway, the two went to a hospital reception room and talked for ten to fifteen minutes. When White's mother arrived, the three of them remained in the room talking together for a while longer. The state argues that this three-way conversation indicates that the original conversation between Orfi and Ryan was not private. We draw an opposite inference. The circumstances leading up to the conversation between Orfi and Ryan, and the fact that they retired to a room away from others, support a reasonable belief that they engaged in a confidential conversation prior to being joined by White's mother.

■ The conversation between Lund and Orfi took place in the hospital waiting room. The state correctly notes that one person

entered to get something to drink and then left. This, without more, however, does not undermine the private character of their conversation.

Third, evidence shows that Orfi's conversations with Ryan and Lund were for the purpose of getting spiritual help. While conversations with, or requests for help from, a religious minister are not per-se efforts to obtain spiritual help, see State v. Black, 291 N.W.2d 208, 216 (Minn.1980) (defendant's request of jail minister to call defendant's friend and tell her to "go ahead and carry out their plans" did not qualify as a request for spiritual aid), these clergy were called to aid a family in crisis. There was no reason for Orfi to speak with them about his life other than that they were religious figures, and he was in need of comfort.

While there was no evidence that Orfi's conversations with Ryan and Lund were in the nature of a confession, the statute does not require that to be the case. The privilege requires either a penitential confession or conversation for the purpose of seeking "religious or spiritual advice, aid, or comfort." Minn.Stat. § 595.02, subd. 1(c); Lender, 266 Minn. at 564, 124 N.W.2d at 358.

Conversations between Orfi and a member of the clergy while White's mother or the doctor were present fall outside of the privilege because Orfi could not have intended confidentiality at that moment. Likewise, Ryan's testimony on Orfi's general demeanor, observable by all at the hospital, was not based on confidential information and is unprotected by the privilege. However, we conclude that all other portions of the testimony of Ryan and Lund should have been excluded as falling under the clergy privilege set forth in Minn.Stat. § 595.02, subd. 1(c).

We cannot end our inquiry on the clergy privilege at this point, however. We must ask whether the erroneously admitted testimony prejudiced Orfi's case. We conclude that it did not. Ryan's only testimony based entirely on his private conversation with Orfi was that Orfi was going through a hard time financially and at school, and that he asked about Andrew. Other witnesses (including Orfi himself) testified, in greater detail, about his financial difficulties and frustration with lack of employment.

Lund's testimony was potentially more damaging than Ryan's. In addition to describing Orfi's general frustration and stress, Lund testified that Orfi told him he was trying to teach Andrew to be a "polite little boy," and that he would withhold food from Andrew until Andrew said "thank you." Orfi also told Lund that he wanted to be a better father than his own father had been. Lund concluded from their conversation that this food deprivation technique was not a one-time incident, but rather demonstrated Orfi's manner of parenting.

There was conflicting testimony on Orfi's treatment of Andrew. Lund's testimony supported the state's theory regarding Orfi's "feeding" treatment of Andrew. We recognize, also, that a minister's testimony is especially likely to be weighed favorably with a jury. Seward Reese, Confidential Communications to the Clergy, 24 Ohio St.L.J. 55, 82 (1963). The potential harm of Lund's testimony that Orfi withheld food from Andrew, however, was mitigated by the fact it was repetitive of testimony of others, including police officers. Orfi's former wife also testified that he tried to control strictly the timing of their son's feeding and made that child place his hands flat on the table before receiving meals. Finally, there was medical testimony that Andrew suffered from failure to thrive.

A defendant should be given a new trial unless, beyond a reasonable doubt, the error had no significant impact on the jury. State v. Olson, 482 N.W.2d 212, 216 (Minn. 1992). Because we believe that the erroneously admitted testimony was generally cumulative, and that other evidence against Orfi was substantial, we conclude that the error of the trial court in receiving testimony from the two members of the clergy was harmless beyond a reasonable doubt.

## II.

Evidence of crimes or bad acts other than the one for which a defendant is charged may be admitted as evidence of motive, intent, identity, common scheme or plan,

or absence of mistake or accident. Minn. R.Evid. 404(b). *State v. Spreigl,* 272 Minn. 488, 494–95, 139 N.W.2d 167, 171–72 (1965).

The trial court allowed Orfi's former wife to testify that Orfi demanded polite behavior from and strictly controlled the feeding of their son. While both Orfi and his former wife had been named in a neglect petition concerning this son, one who is in a position to be an accomplice is not necessarily incompetent to testify to other crimes evidence. *See State v. Olson,* 459 N.W.2d 711, 715 (Minn.App.1990) (evidence of prior bad acts was admissible against defendant even though potential accomplice did not expressly deny involvement in the offense), *pet. for rev. denied* (Minn. Oct. 25, 1990). We believe that notwithstanding potential bias and lowered credibility on the part of Orfi's former wife, the trial court's determination that there was clear and convincing evidence of Orfi's actions toward his son was within its discretion.

A defendant's past abusive conduct with other children "demonstrates a callous attitude toward children which is consistent with a person who has demonstrated an application of inappropriate force to kids." *State v. Ostlund,* 416 N.W.2d 755, 762 (Minn.App. 1987) (quoting state's argument to the court), *pet. for rev. denied* (Minn. Feb. 24, 1988). Orfi's callous attitude, as described by his former wife, was relevant in determining whether Orfi, White or a disease caused Andrew's injuries and death.

A trial court's determination that the probative value of evidence substantially outweighs its prejudice against the defendant will not be overturned absent a clear abuse of discretion. *State v. Drieman,* 457 N.W.2d 703, 709 (Minn.1990). The court minimized the prejudice by narrowly limiting the scope of the testimony of Orfi's former wife. The court gave a cautionary instruction at the time the evidence was admitted and again at the close of the trial.

Proof that Orfi either violently shook or threw, or threw something at Andrew to cause his death was based on circumstantial evidence. Orfi's theory of the case was that accidents or disease must have caused Andrew's injuries and death. We cannot conclude that the trial court erred in determining that the *Spreigl* evidence given by Orfi's former wife was necessary to the state's case.

### III.

Orfi claims there was insufficient evidence of an assault and of malicious punishment of Andrew necessary to sustain his convictions for second degree murder.[1] In reviewing Orfi's claim, we must view the evidence in the light most favorable to the verdict and assume the jury believed the state's witnesses and disbelieved contrary evidence. *State v. Lanam,* 459 N.W.2d 656, 662 (Minn.1990), *cert. denied,* 498 U.S. 1033, 111 S.Ct. 693, 112 L.Ed.2d 684 (1991). Circumstantial evidence is entitled to the same weight as direct evidence, so long as the circumstances are consistent with the defendant's guilt and inconsistent with any rational hypothesis except that of guilt. *State v. Race,* 383 N.W.2d 656, 661 (Minn.1986). The stricter standard of review of a conviction based on circumstantial evidence still recognizes that a jury is in the best position to evaluate the evidence, and its verdict is entitled to due deference. *Id.* at 662.

We believe that the circumstantial evidence of assault and malicious punishment by Orfi was sufficient to sustain the jury's findings. Dr. Rahul Aggarwal, who treated Andrew after his resuscitation, testified that Andrew's "broken" hair and the hemorrhages in his eyes left him with no doubt Andrew was violently shaken. Drs. Thomas Uncini and Janice Ophoven, pathologists, also testified that Andrew was violently shaken. Dr. Uncini stated that the shaking was the cause

---

1. Murder in the second degree is defined as unintentionally causing the death of a human being "while committing or attempting to commit a felony offense." Minn.Stat. § 609.19(2) (1992). The underlying felonies in Orfi's case were: Minn.Stat. § 609.221, assault in the first degree; Minn.Stat. § 609.223, subd. 1, assault in the third degree, and Minn.Stat. § 609.377, malicious punishment of a child, an "intentional act or a series of intentional acts with respect to a child, [evincing] unreasonable force or cruel discipline that is excessive under the circumstances."

of Andrew's full cardiac respiratory arrest. Dr. Uncini also testified that Andrew was a battered child within the definition of the battered child syndrome. He based his opinion on Andrew's bruised head, the subdural hematoma, the pinch marks on the ear, the condition of his hair, and that he was very thin. Uncini also testified that Andrew's failure to thrive related to child abuse or neglect, and there was no indication of seizure disorder or metabolic disorder.

The jury was not required to credit Orfi's hypothesis that a metabolic disorder or accident caused Andrew's death. *See Ostlund,* 416 N.W.2d at 760 (when reputable doctors have reasonable, conflicting opinions, jury may determine which to believe). The evidence before the jury was sufficient to sustain the verdicts it returned.

## IV.

We have reviewed and considered the three issues raised in Orfi's pro se brief and find them without merit.

■ First, Orfi claims that the state and hospital lost or destroyed evidence. Orfi failed, however, to show that the destruction was intentional and that its exculpatory value was apparent and material. *See State v. Friend,* 493 N.W.2d 540, 545 (Minn.1992) (listing elements for destruction of evidence appeal).

■ Next, Orfi focuses on the state's objection to a question put to Orfi's medical expert on direct examination. The objection was apparently sustained, although the matter was decided off the record. Even if the issue was properly preserved for appeal, there is no indication that this objection impinged on Orfi's ability to put forth his theory. *See State v. Bergeron,* 452 N.W.2d 918, 926 (Minn.1990) (trial court may restrict repetitious evidence as long as defendant has full and fair opportunity to put forth his theory of the case).

■ Third, Orfi's challenge of the trial court's refusal to order a change of venue makes no claim that publicity affected any particular juror in a prejudicial way. *See State v. Hogan,* 297 Minn. 430, 437, 212 N.W.2d 664, 669 (1973).

## DECISION

The conversations between appellant and two members of the clergy should have been protected by the testimonial privilege, but the admission of testimony regarding those conversations was harmless. *Spreigl* evidence was properly admitted. The evidence was sufficient to convict appellant of the three counts of second degree murder. Appellant's due process rights were not violated by the state's failure to take or preserve certain physical evidence. Appellant had ample opportunity to put forth his theory of the case. The trial court did not err in denying appellant's motion for change of venue.

**Affirmed.**