Tina ELLIS, et al., Plaintiff(s),

v.

UNITED STATES of America,
et al., Defendant(s).

No. 94–C–778 G.

United States District Court,
D. Utah,
Central Division.

April 18, 1996.

Dale A. Kimball, Robert S. Clark, Mark F. James, Gregory M. Hess, Kimball, Parr, Waddoups, Brown & Gee, Salt Lake City, Utah, for Plaintiffs.

Scott M. Matheson, Jr., United States Attorney, Stephen J. Sorenson and Carlie Christensen, Assistant United States Attor-

neys, Salt Lake City, Utah for defendant United States.

Robert G. Wright, Craig C. Coburn, Richards, Brandt, Miller & Nelson, Salt Lake City, Utah, for defendant Washington County Water Conservancy District.

## MEMORANDUM AND ORDER

BOYCE, United States Magistrate Judge.

The defendant, United States, has made a motion to compel to obtain tape recordings and transcripts created during a meeting of defendant Mark Brewer and three members and office holders of the Church of Jesus Christ of Latter–Day Saints (LDS) (Mormon).

The defendant with two other adults and five teenage boys, members of the LDS Church, made a journey into the Kolob Creek Canyon in Zion National Park. Two adults were drowned during the trek and the event was a tragic mishap. The trip was an LDS Church sponsored event. Following the tragedy, Mark Brewer met on July 21, 1993 with Leroy Turner, President of the Granite Park Stake and Mark Easton, his first counselor. A stake is an organizational unit within the LDS Church. A stake is made up of wards which are the basic organizational unit of the Church. Craig Criddle was also present. Criddle was the Bishop of the Riviera Ward. The statement of Mark Brewer about the episode was tape recorded. Evidence has been presented that the meeting with the named Church officials was to obtain a first hand account of the trip in order to handle media inquiries and to be able to address the needs of the family members and others. The Church officials also wanted to reassure Brewer of their support and concern for him.

None of the Church officials considered the matter to be a confession or personal counseling session. President Turner considered the matter an "information exchange." The meeting was recorded and eventually transcribed. The LDS Church asserted, on behalf of Brewer, a clergy privilege to the production of the transcripts. The plaintiff, Mark Brewer, also has invoked the clergy privilege. Therefore, the only person now

properly invoking the privilege is Mark Brewer. Brewer believed that the meeting, which was requested by Easton, was to "discuss the trip and for counseling." The Church leaders did want to help Brewer. The meeting took place in private in the "high council" room of the Granite Park LDS Stake Center.

■ The parties rely on Rule 503 of the *Utah Rules of Evidence* as the relevant privilege standard. The jurisdictional basis for the suit against the United States is the Federal Tort Claims Act (FTCA). Liability under the FTCA is determined by state law. 28 U.S.C. § 1346(b) ("... if a private person, would be liable to the claimant in accordance with law of the place where the act or omission occurred".) The United States is liable if a private individual would be liable under state law. Id. Substantive state law is the law of decision in this case. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Flynn v. United States*, 902 F.2d 1524 (10th Cir.1990); *Franklin v. United States*, 992 F.2d 1492 (10th Cir.1993).

Rule 501, F.R.E. provides that as to the law of privileges:

However, in civil actions and proceedings with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

■ This case is not a federal question case, but is to be decided on Utah law. Therefore, Utah law determines the applicable clergy privilege. *Oslund v. United States*, 128 F.R.D. 110 (D.Minn.1989) (In an FTCA action Minnesota privilege law as to physician/patient was applicable).

The Utah clergy privilege has had a long history. *Scott v. Hammock*, 133 F.R.D. 610 (D.Utah 1990). In *Scott*, this court ruled the existing Utah statutory privilege applied to a father's non-confessional but confidential communication made within the doctrines of the LDS Church for ecclesiastical guidance. Subsequently, the question was referred to the Utah Supreme Court. That court answered the question in support of the privi-

lege. *Scott v. Hammock,* 870 P.2d 947 (Utah 1994). The privilege was upheld where the purpose was to seek spiritual counseling, guidance or advice from a cleric acting in his professional role pursuant to the discipline of the church involved. Those communications not made to the cleric in a "professional character" or outside of the "discipline enjoined by the church" were held not protected. Id. at p. 955. The court expressly approved the discussion of the term "discipline" in *In re Swenson,* 183 Minn. 602, 237 N.W. 589, 591 (1931). The Utah Supreme Court went on to observe:

> Whether communications between a cleric and a parishioner are confidential may depend on the facts and circumstances surrounding the communications, such as whether the situs of the communication indicates an intent that the communication be confidential, whether the conversation was casual in nature or undertaken by the cleric and the parishioner with a sense that the parishioner's moral conduct was at issue, and whether persons not concerned with the subject matter were present. A communication that does not take place in private or that is made in the presence of others not intimately and directly concerned with the issue may indicate that the parties involved did not intend the conversation to be confidential.

Following the Utah Supreme Court's decision, the court adopted Rule 503, Utah Rules of Evidence, entitled "Communication to Clergy." Subsection (a) defines "cleric" which applies to the three officials involved in this instance, however, it should be noted their status is because they are "other similar functionary" to a rabbi or priest. It is important that the person to whom the communication is made have a religious function at the time the communication is made. The LDS Church officials are lay clergy.

■ The person having the privilege in this case is Mark Brewer who made the communication, although it is proper for a cleric to claim the privilege on behalf of the communicant Rule 503(c) U.R.E. The communication must be confidential in that it must be made in private and not be intended for further disclosure except in furtherance of the purpose of the communication. This language of Rule 503, U.R.E. appears to be an effort to incorporate the holding in the *Scott v. Hammock,* cases, infra, that a subsequent transmittal of a communication may still be confidential if that was intended as a part of the purposes of the communication. A communication to a cleric intended for publication outside the religious uses of the church would not be privileged. In that regard, a communication for an informational, administrative, or public relations purpose would not be confidential.

■ Rule 503(b), U.R.E. provides for a privilege to refuse to disclose and to prevent further disclosure of a "confidential communication to a cleric in the cleric's *religious capacity* and necessary and proper to enable the cleric to discharge the functions of the cleric's office according to the usual course of *practice* or *discipline*." (Emphasis added). Religious capacity and church office are not necessarily identical. The *Advisory Committee Note* to Rule 503, U.R.E. is instructive. The Note states that such a privilege is generally favored "at least to the extent that the communication is entrusted to the cleric in the cleric's religious capacity." The Utah Advisory Committee adopted in Rule 503, U.R.E., the form of Rule 506 of the proposed *Federal Rules of Evidence,* 1973, (not adopted). The Utah Committee Note observes the "scope of the proposed privilege falls between a privilege narrowly restricted to doctrinally required confessions and a privilege broadly applicable to all confidential communications with a cleric." The obvious conclusion from this observation is that not all confidential communications to a cleric are protected. The Note makes clear the communication must be in the cleric's "religious capacity." It must be pertinent to religion not just church administration or information. The Note states "The privilege does not extend to confidential communications with a cleric when the cleric is acting in any capacity other than a religious capacity." Thus, communications that are part of an organization function but without a religious aspect or nature are not protected. The language as to the discharge of the cleric's

office according to the usual course of practice or discipline was intended to extend the privilege "beyond doctrinally required confessions." The committee relied on *State v. Burkett*, 357 N.W.2d 632 (Iowa 1984) as authority for the language that was used. *Burkett*, supra, involved conversations of a jail inmate with the jail Chaplain. The jail Chaplain was a minister and the conversations between the inmate and the Chaplain were received in confidence and in the capacity of a clergyman and necessary to performance of his duties as a Chaplain. The clear implication in *Burkett* is that the communication to the Chaplain were of a religious nature. Id. at p. 637.

■ The privilege for communications between priest and penitent may have had a recognized existence in the common law courts. Wigmore, *Evidence* § 2394 (McNaughton Rev, 1961) § 2394.[1] *Cook v. Carroll* [1945] Ir.R. 515, 517, 519–21 (High Ct.). Utah has a long history of a clergy/communicant privilege, at least since 1870. *Scott v. Hammock*, 870 P.2d at p. 950. The basis of the privilege is the "protection of religious conscience." McCormick *supra.* This reinforces the conclusion that the communication must be essentially for an ecclesiastical and religious purpose. To the extent that plaintiffs contend the Utah privilege under Rule 503, U.R.C..applies if the communication to the cleric is simply necessary to enable the cleric to perform any function of the clerk's office is too broad and incorrect. The privilege applies only to communications that are related to a religious function.

The plaintiff asserts that the place of the communication shows a confidential purpose to which the privilege would apply, *Scott v. Hammock*, supra, 870 P.2d at p. 955, and that this is also corroborated by the religious offices of the persons to whom the communication was directed. Also at a hearing on this motion counsel described Brewer as almost a "basket case." This supports plaintiff's claim of confidentiality of the communication. However, the religious aspect requirement is not obvious.

On the other hand, the United States' evidence indicates that Mark Brewer did not seek out counseling but was invited to advise the sponsoring church officials as to what happened. Their interests were of knowing about the event in order to handle the media and attend to other's interests. This supports a conclusion of lack of confidentiality and a secular purpose. The fact that the meeting was recorded supports this conclusion to some extent.[2] Also, the United States contends some of the content of the meeting was disclosed to others outside of the clergy privilege. It became apparent to the court during argument on this matter that Mark Brewer's meeting with the church officials could have ranged over matters that were ecclesiastical and matters that were essentially secular in character.

The United States urged the court to conduct an in camera examination of the tape recording to determine if the clergy privilege was properly invoked (File Entry # 140, # 141). No authority specifically addressing in camera consideration of the clergy privilege has been cited, however, the United States does argue that in other contexts, in camera inspection to determine the applicability of a privilege has been approved. *Kerr v. United States District Court for Northern District of California*, 426 U.S. 394, 406, 96 S.Ct. 2119, 2125–26, 48 L.Ed.2d 725 (1976) (prisoner's files); *United States v. Nixon*, 418 U.S. 683, 706, 94 S.Ct. 3090, 3106–07, 41 L.Ed.2d 1039 (1974) (executive privilege, refusing to find privilege diminished by in camera review); *United States v. Reynolds*, 345 U.S. 1, 10, 73 S.Ct. 528, 533, 97 L.Ed. 727 (1953) (cautioning against automatic judicial consideration of in camera national military secrets); *Gomez v. City of Nashua, N.H.*, 126 F.R.D. 432 (D.N.H.1989) (prosecutor's deliberative process privilege). The plaintiffs have cited no authority on the issue pertinent to the privilege invoked in this case.

---

1. McCormick, *Evidence* 4th Vol. 1 p. 286 (1992) refers to Wigmore's position on the matter as "grudging acceptance" of the privilege.

2. It was possible for a church official to have been concerned about potential liability of the church, at least as to any psychological harm any of the boys may have encountered.

■ *Cimijotti v. Paulsen*, 219 F.Supp. 621 (D.N.D.Iowa 1963) was a civil suit based on diversity jurisdiction. The court held communications to a priest properly protected under Iowa law, this included a statement by a non-penitent to corroborate a penitent's statement which was required by church law, citing *In re Swenson*, 183 Minn. 602, 237 N.W. 589 (1931).[3] The court held the person claiming the privilege "is not required to disclose the communication to enable the court to determine whether it is privileged, and before directing the witness to answer." The court held that the facts and circumstances leading up to the communication could be used to determine if the privilege claim was mistaken. 219 F.Supp. at 625–626. *Cimijotti* is correct, disclosure is not necessarily required. However, the court did not hold that a court could not require an in camera inspection where the circumstances of the privilege claim are ambiguous. The existence and scope of a privilege, where state law provides the rule of decision, is a matter of state law for a federal court to interpret. Rule 501, F.R.E. However, the judicial procedural mechanism to determine whether such a privilege exists is a matter of federal law. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Therefore, the issue of in camera inspection should be determined by federal procedure as determined by this court.

■ In *United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) the court continued to approve in camera inspection in proper circumstances. The case arose in the context of a claim of lawyer/client privilege where an assertion for the applicability of the crime-fraud exception was made. The court, referring to Rule 104(a) F.R.E., stated that the court could examine the communication in camera once evidence was introduced sufficient to support a good faith belief by a reasonable person that an exception to the privilege may be applicable:

> We conclude that no express provision of the Federal Rules of Evidence bars such use of in camera review, and that it would

be unwise to prohibit it in all instances as a matter of federal common law.

> 491 U.S. at p. 565, 109 S.Ct. at p. 2627.

The court said neither Rule 104(a) nor 1101(c), F.R.E. bars in camera review.

We begin our analysis by recognizing that disclosure of allegedly privileged materials to the district court for purposes of determining the merits of a claim of privilege does not have the legal effect of terminating the privilege. Indeed, this Court has approved the practice of requiring parties who seek to avoid disclosure of documents to make the documents available for in camera inspection, see *Kerr v. United States District Court for Northern District of Cal.*, 426 U.S. 394, 404–405, 96 S.Ct. 2119, 2124–25, 48 L.Ed.2d 725 (1976), and the practice is well established in the federal courts.

> Id. at p. 568–69, 109 S.Ct. at p. 2629.

The in camera inspection is not automatic. Id. at p. 571, 109 S.Ct. at p. 2630. The court must make the determination in "light of the facts and circumstances of the particular case." In this case the United States has presented evidence by which a reasonable person could conclude the privilege did not apply. If in camera inspection is appropriate in this equally important privilege circumstance, it should apply to an invocation of a clergy privilege in this case. For that reason, following the *Zolin* analysis, the court ordered an in camera review of the transcripts. A single transcript was submitted under seal.

■ An examination of the transcript, not unexpectedly, aided the court in the resolution of the privilege claim. Based on the Utah clergy privilege, Rule 503, U.R.E., the communication of Mark Brewer on July 21, 1993 is not privileged. The communication is a narrative of the events of the Kolob Canyon expedition. It is a clear statement of Brewer's knowledge and perceptions. Although the communication is at times moving and in some places poignant and stirring, it was not ecclesiastical or religious. It was not a communication for doctrinal, spiritual, or religious purposes. It was a communication

---

3. *In re Swenson*, supra, was cited approvingly in *Scott v. Hammock*, supra, by the Supreme Court.

**544**

to impart information and report about an event for purposes of informing and acquainting the listener to what had happened. The Church leaders did not receive the communication within the religious role of clerics, but as clerics performing an attendant executive function. The communication is not within the clergy privilege and must be disclosed. Therefore,

**IT IS HEREBY ORDERED** that the transcript submitted under seal and any recording of the communication of the transcript must be produced by plaintiffs to the United States and the motion to compel of the United States is granted.