[No. 22790-8-II.    Division Two.    July 17, 1998.]

THE STATE OF WASHINGTON, *Respondent*, v. SCOTT A. MARTIN, *Defendant*, RICH HAMLIN, *Petitioner.*

622

*Steven T. O'Ban* of *Ellis, Li & McKinstry*, for petitioner Hamlin.

*Gary E. Hood* and *John R. Connelly, Jr.*, of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*, for defendant Martin.

*John W. Ladenburg, Prosecuting Attorney*, and *Kathleen Proctor* and *W. Stephen Gregorich, Deputies*, for respondent.

*Steven T. McFarland* on behalf of Christian Legal Society, amicus curiae.

HOUGHTON, C.J. — Pastor Rich Hamlin appeals a trial court order finding him in contempt for refusing to provide testimony in the criminal trial of Scott Anthony Martin, whom the State charged with second degree murder for the death of his infant son. We hold that Martin's statements to Pastor Hamlin, to the extent they were confidential, are privileged under RCW 5.60.060(3). We, therefore, reverse and remand for further proceedings.

## FACTS

Pastor Hamlin is an ordained minister of the Evangelical Reformed Church of Tacoma. On July 7, 1997, Leona Harri, Scott Martin's mother, contacted Pastor Hamlin at the offices of Youth for Christ of Tacoma, where Pastor Hamlin works part-time. Harri expressed concern for her son and requested that Pastor Hamlin meet with Martin at his apartment. Pastor Hamlin had not met either Martin or Martin's mother before this time.

Later that day, Pastor Hamlin went to Martin's apartment. When Pastor Hamlin arrived, Harri was present in the apartment and introduced the pastor to Martin as "the preacher." Harri remained in the apartment during Pastor Hamlin's "spiritual" consultation with Martin, which lasted about 60 to 90 minutes. Pastor Hamlin met with Martin on at least two additional occasions before Martin turned himself over to the police. One meeting took place at Madigan Army Medical Center, where Martin was accompanied by his mother, wife, and several others, and the other at a friend's home in Federal Way.

On July 9, 1997, Detective Brent Bomkamp of the Pierce County Sheriff's Department spoke with Martin, who at that time asked to speak to an attorney. On July 10, Detective Bomkamp also met with the infant's mother, who stated that Martin admitted to her the previous day that he "did it." She told the detective that Martin told her that he had shaken the infant on July 5, 1997, because the infant was fussing and Martin lost control.

On July 11, 1997, the State charged Martin with second degree murder for the death of his three-month-old son. The State alleged that Martin caused the child's death by violently shaking the infant.

On September 24, 1997, the State filed a motion requesting the trial court to determine whether the statutory clergy privilege, RCW 5.60.060(3), applied to Martin's statements to Pastor Hamlin. The trial court relied upon *State v. Buss*, 76 Wn. App. 780, 887 P.2d 920 (1995), and determined that the privilege did not apply. According to the trial court, the third prong of the *Buss* test had not been satisfied "as there was no showing through testimony presented that defendant [Martin] felt he was constrained by any religious obligation to make the statement he made to Pastor Hamlin."

Martin then petitioned the Supreme Court for discretionary review. The Supreme Court, however, denied the petition.

On November 24, 1997, the State moved for an order allowing the State to depose Pastor Hamlin. On December 4, 1997, the trial court ordered Pastor Hamlin to appear for a deposition on December 16, 1997. At the deposition, Pastor Hamlin answered questions concerning the circumstances of his conversations with Martin, but refused to answer questions regarding the content of those conversations based upon his religious free exercise rights.

On January 8, 1998, the trial court heard argument to determine whether Pastor Hamlin had a legitimate constitutional basis for refusing to disclose the contents of his conversations with Martin. The State became aware of Pas-

tor Hamlin's involvement when Detective Bomkamp met him at Madigan Army Medical Center while the detective was investigating a report of the infant's injuries. Pastor Hamlin told the detective that he had met with Martin and his mother, and that Martin had disclosed more information to the pastor than to Child Protective Services. The State had also learned of Pastor Hamlin's conversations with Martin through a Child Protective Services referral. In addition, at some point after meeting with Martin, Pastor Hamlin allegedly disclosed part of the conversations to two colleagues at Youth for Christ.

Upon conclusion of the hearing, the trial court issued findings of fact and conclusions of law and determined that Pastor Hamlin did not have an independent constitutional right to withhold information from the State. The court entered an order of contempt for Pastor Hamlin's failure to answer questions regarding the substance of his conversations with Martin. Because Pastor Hamlin continued to refuse to disclose the requested information, the trial court ordered him to report on January 16, 1998, to be taken into custody for violating the court's order.

Pastor Hamlin then petitioned this court for discretionary review. A commissioner determined there was a debatable issue, based upon *Mockaitis v. Harcleroad,* 104 F.3d 1522 (9th Cir. 1997),[1] granted review, and stayed the contempt order pending appeal. This court also granted the State's request for an emergency stay of Martin's criminal trial pending Pastor Hamlin's contempt appeal.

## ANALYSIS
### Applicability of Privilege

Pastor Hamlin contends that he cannot be compelled to testify as a clergy member because his conversations are privileged under RCW 5.60.060(3). In response, the State

---

[1] In *Mockaitis v. Harcleroad,* 104 F.3d 1522 (9th Cir. 1997), the court held, inter alia, that a district attorney's tape-recording of a murder suspect's confession to a Catholic priest violated the priest's religious free exercise rights under federal law.

cites *Buss*, 76 Wn. App. 780, and submits the privilege is unavailable because (1) the "course of discipline" of Pastor Hamlin's religion does not "enjoin" its members to make individual, private confessions of sins, (2) Martin was not enjoined by any church doctrine to make a confession, and (3) Martin's conversations with Pastor Hamlin were not confidential.

The clergy member privilege, RCW 5.60.060(3), provides that

> [a] member of the clergy or a priest shall not, without the consent of a person making the confession, be examined as to any confession made to him or her in his or her professional character, in the course of discipline enjoined by the church to which he or she belongs.

In construing this statute, the trial court here concluded that Martin's statements to Pastor Hamlin were not privileged. Following *Buss*, 76 Wn. App. 780, the trial court ruled that the defendant bore the burden to demonstrate that three elements were satisfied: (1) that his communication to Pastor Hamlin was a "confession"; (2) that Pastor Hamlin received the confession in the course of the discipline to which he belonged; and (3) that the *confessor*, Martin, felt constrained by his religious doctrine to disclose his alleged criminal conduct to a clergy member.

## Confession Constrained by Religious Beliefs

The trial court determined that the clergy member must first consider the communication a "confession" *and* that the individual making the penitential statements must likewise "feel constrained to make a confession." Based upon this interpretation of the statutory privilege, the trial court ruled that Martin's statements to Pastor Hamlin, although confessional in nature, were not protected because Martin failed to adequately demonstrate that *he* felt constrained by *his* religious beliefs to disclose his alleged criminal conduct. As the trial court stated, Martin may have "felt a need to say something," but the requisite "sense of spiritual obligation" was not present.

In *Buss*, the defendant met with a "nonordained family minister" after a Catholic Church referral for counseling, during which time the defendant made incriminating statements. Narrowly interpreting the clergy member privilege, the court explained that nonordained church counselors were not "clergy" within the meaning of the statute. The court further explained that the terms "confession" or "course of discipline" included "only the sacrament of confession," and, adopting language from 5A KARL TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 184, at 78 (3d ed. 1989), stated that "[o]nly confessions specifically authorized by particular churches seem to be included." *Buss*, 76 Wn. App. at 786. Because the church counselor was not a clergy member and the counseling session did not amount to a confession, the court held that the privilege did not protect the defendant's statements. *Id.*

Critical to the *Buss* court's holding was that the church counselor was "nonordained." *Id.* at 784-85. But also significant was that "[n]othing in the record suggests that Buss [the defendant] was constrained by her religious doctrines to disclose her criminal actions" to the church counselor. *Id.* at 786. The court therefore held that the " 'discipline enjoined by the church' requirement is not satisfied." *Id.*

We disagree with the *Buss* court's interpretation of the clergy member privilege, and decline to follow its reasoning. We hold that the statutory privilege applies to Martin's confidential statements made to Pastor Hamlin and therefore reverse the trial court.[2]

## Confession

■ The trial court determined that Martin's conversa-

---

[2]We recognize that at the time the trial court ruled that Martin's statements to Pastor Hamlin were not privileged, *Buss* was the only Washington authority extensively interpreting the applicability of RCW 5.60.060(3) to confessions. *Cf. Rhinehart v. Seattle Times Co.*, 51 Wn. App. 561, 572-73, 754 P.2d 1243 (rejecting argument that statute precluded discovery of religious organization member names and addresses), *review denied*, 111 Wn.2d 1025 (1988), *appeal dismissed, cert. denied*, 490 U.S. 1015 (1989).

tions with Pastor Hamlin were "confessional in nature." In construing the term "confession," the trial court explained that a statement was confessional if the clergy member receiving the communications "considers it to be a confession." The trial court reasoned that whether a statement was a confession was for the religion to decide, and it was not the trial court's role to decide what types of communications constitute confessions within the meaning of a particular religion. We agree. The trial court properly concluded that Martin's statements to Pastor Hamlin were confessions because Pastor Hamlin considered those communications to be such.

## Church Discipline

■ Again relying upon *Buss*, the trial court further ruled that Martin's confession was not made pursuant to a discipline enjoined by the church. The *Buss* court cited 5A KARL TEGLAND, § 184, at 78, as authority for interpreting the statute to mean that the confessor should be constrained by religious doctrines to make a confession. *Buss*, 76 Wn. App. at 786 ("apparent purpose of the statute is to protect formal church doctrines and procedures by protecting confessors who are constrained by such doctrines to follow confession"). The commentator cites no authority for this proposition, but notes that "[o]nly confessions specifically authorized by particular churches *seem to be included.*" (Emphasis added.)[3]

■■ Our interpretation of the statutory language leads

---

[3]We also note that Tegland's assertion is contrary to the weight of authority in other states addressing similar statutes. As many states have properly recognized, the clergy member privilege should be liberally interpreted to include more than just those religions with formalized systems of confession, contrary to the *Buss* court's rationale. *See, e.g., Scott v. Hammock*, 870 P.2d 947, 952 (Utah 1994); (interpreting "confession" broadly is necessary and important because "most churches do not set aside formal occasions for special private encounters labeled 'confession,' [and so] less formal consultation must be privileged if the privilege is not in effect to be limited to Roman Catholics.") (quoting Mary Harter Mitchell, *Must Clergy Tell?*, 71 MINN. L. REV. 723, 748 (1987) (internal quotes omitted)); *State v. Orfi*, 511 N.W.2d 464, 470 (Minn. Ct. App. 1994) (clergy privilege did not require that conversations be in nature of "confession" but simply conversation for purpose of seeking religious or spiritual advice, aid, or comfort); *In re Grand Jury Investigation*, 918 F.2d 374, 384-85 (3d Cir. 1990) (clergy-

us to the contrary conclusion. The phrase "in the course of discipline enjoined by the church to which he or she belongs" refers to the rules or practices of the religion to which the *clergy member* belongs. *See In re Swenson*, 237 N.W. 589, 590 (Minn. 1931). The pronouns "him or her" and "he or she" refer to the "a member of the clergy or a priest" receiving the penitential communication, and not the *penitent*. The statute does not require that the communicant be enjoined by his or her religion to confess or to seek spiritual counseling. Rather, the statute requires only that the clergy member receiving the confidential communication be enjoined by the practices or rules of the clergy member's religion to receive the confidential communication and to provide spiritual counsel.

As one court explained, "[t]he statute has a direct reference to the church's 'discipline' of, and for the clergy [member] and as to his [or her] duties as enjoined by its rules or practice." *Swenson*, 237 N.W. at 591. Such "discipline" refers to the duties and obligations "traditionally enjoined upon all clergy [members] by the practice of their respective churches." *Swenson*, 237 N.W. at 591. It is the clergy member who must be constrained by the dictates of his or her religion to be "alert and efficient in submission to duty, to concern themselves" in providing spiritual aid and counseling. *Swenson*, 237 N.W. at 591. It is the course

communicant privilege is not limited to communications between Roman Catholic priests and their penitents); *Ziske v. Luskin*, 138 Misc. 2d 38, 524 N.Y.S.2d 145 (Sup. Ct. 1987) (clergy member privilege protects from disclosure not only confessions which are compulsory under religious doctrine, but religious counsel, advice, solace, comfort, absolution, or ministration); *People v. Johnson*, 115 A.D.2d 973, 497 N.Y.S.2d 539 (1985) (same); *In re Fuhrer*, 100 Misc. 2d 315, 419 N.Y.S.2d 426 (Sup. Ct. 1979) (clergy member-penitent privilege is to be interpreted broadly and liberally; privilege protects more than just confessions which are compulsory under religious doctrine, but also religious counsel, advice, solace, absolution, and ministration); *State v. Hartman*, 281 N.W.2d 639, 642 (Iowa Ct. App. 1979) (clergy member's privilege is to be liberally construed); *Allen v. Lindeman*, 259 Iowa 1384, 148 N.W.2d 610, 614 (1967) (statutes governing privileged communications should be given liberal construction); *People v. Shapiro*, 308 N.Y. 453, 126 N.E.2d 559, 562, 51 A.L.R.2D 515 (1955) (statutes relating to privileged communications, including clergy member-confessor privilege, are accorded a broad and liberal construction); *In re Swenson*, 237 N.W. 589 (Minn. 1931) (Legislature never intended absurdity of recognizing clergy member privilege as applicable to only religions with compulsory confessions, such as Roman Catholic Church).

of discipline enjoined by the clergy member's practice by which the clergy member is to show the communicant the error of his or her way; to teach the penitent the right way; to point the way to faith, hope, and consolation; and to lead the penitent to seek atonement. *Id.* at 591.

Although the clergy member privilege, RCW 5.60.060(3), as originally drafted in 1870,[4] may be dated in form, under a proper interpretation, "discipline enjoined" refers to the duties of the clergy member and to the rules of such clergy member's faith. The clergy member must be constrained by his or her religious dictates to receive penitential communications and to provide spiritual instruction and guidance in return.[5] *See id.* at 590-91; *see also Scott v. Hammock*, 870 P.2d 947, 951 (Utah 1994) (confession construed in light of particular doctrine of church discipline to which the clergy member belongs); *People v. Burnidge*, 279 Ill. App. 3d 127, 664 N.E. 2d 656, 659, 211 Ill. Dec. 19 (1996) (clergy member privilege recognized if communication enjoined by rules or practices of religion the minister professes), *aff'd*, 178 Ill. 2d 429 (1997); *State v. Alspach*, 524 N.W. 2d 665, 668 (Iowa 1994) (under clergy member privilege, receipt of communication must be necessary and proper for discharge of clergy member's office); *De'udy v. De'udy*, 130 Misc. 2d 168, 495 N.Y.S.2d 616 (1985) (communication is privileged if made to clergy member in order

---

[4]The Legislature stylistically modified the statute in 1989 to include both genders.

[5]Clergy-communicant statutes from several other states are written more precisely. *See, e.g.,* MINN. STAT. § 595.02(1)(c) (1996) ("A member of the clergy or other minister of any religion shall not, without the consent of the party making the confession, be allowed to disclose a confession made to the member of the clergy or other minister in a professional character, in the course of discipline enjoined by the rules or practice of the religious body to which the member of the clergy or other minister belongs"); OR. REV. STAT. § 40.260 Rule 506 (1981) (privilege applies to communications made to a clergy member or minister of any church, religious denomination or organization "in the course of the discipline or practice of that church, denomination or organization . . . under the discipline or tenets of that church, denomination or organization"); CAL. EVID. CODE §§ 1031-1033 (West 1965) (privilege applies to penitential communication made to a clergy member "who, in the course of discipline or practice of his [or her] church, denomination, or organization, is authorized or accustomed to hear such communications and, under the discipline or tenets of his [or her] church, denomination, or organization, has a duty to keep such communications secret").

to enable such clergy member to discharge the functions of office).[6]

Focusing on the clergy member's discipline, the record demonstrates that Pastor Hamlin felt enjoined by his religion to receive Martin's penitential communications and to provide Martin with spiritual counsel. As Pastor Hamlin stated in his affidavit, meeting with individuals and families to provide an opportunity for open discussions is an essential aspect of his religious practice—a service that Pastor Hamlin offers to church members and nonmembers alike. Pastor Hamlin explained that receiving confessions and leading individuals in confession are integral components of his relationship with God; "confession," the pastor stated, "is a necessary component" of his religious practice. Pastor Hamlin's religion, thus, constrains him to provide confessors with spiritual counsel and the opportunity for redemption. It is a duty that the pastor must fulfill based upon the tenets of his faith.

■ The State asserts that Martin was not a member of Pastor Hamlin's church or of any church, and he was not "enjoined" by any particular church doctrine to make a confession. But the language of the statute does not support the State's argument. The statute applies to a "person" making a confession and not a "parishioner." The communicant need not be a member of any particular church or faith, let alone the clergy member's church or faith, requiring the communicant to confess. We are not concerned with the communicant's reasons for speaking to the clergy member; we determine only whether the clergy

---

[6]*See also* McCormick on Evidence, § 76.2 (John W. Strong ed., 4th ed. 1992) (early clergy-penitent statutes limiting the privilege to only those communications enjoined by the communicant's church are now considered unduly and unconstitutionally preferential to certain religions); *see, e.g., Johnson v. Commonwealth*, 221 S.W.2d 87, 89 (Ky. Ct. App. 1949) (under a strict interpretation, clergy member privilege did not apply where defendant did not belong to clergy member's church or any other denomination, or where defendant did not make statements under compulsion of religious duty); *In re Koellen's Estate*, 176 P.2d 544, 551 (Kan. 1947) (clergy member privilege did not apply to decedent's statements where statement was not part of a confession made to the priest in the course of the church to which the decedent belonged).

member's practice enjoins the clergy member to receive the communication.[7] Hence, the fact that Martin did not belong to Pastor Hamlin's church does not negate the privilege.

## Confidentiality and Waiver

The State further contends that Martin's conversations with Pastor Hamlin are not privileged because they were not confidential. The State asserts that Martin's mother was in the apartment during the Pastor's initial meeting with Martin and infers that she was present in the room when Martin discussed his conduct with Pastor Hamlin. The State also argues that other individuals were present during the pastor's various visits with Martin and that Pastor Hamlin shared the contents of Martin's communications with two of his colleagues. According to the State, "[n]one of Pastor Hamlin's conversations with the defendant were completely private."

■ The clergy member privilege applies only to communications that are confidential. *See State v. Maxon*, 110 Wn.2d 564, 572, 756 P.2d 1297 (1988) (evidentiary privileges require confidentiality); *see also Hammock*, 870 P.2d at 956 (clergy member statute requires that communications be made in confidence); *De'udy*, 495 N.Y.S.2d at 618 (communications must have been made and received confidentially). Whether a communication is confidential turns on the communicant's reasonable belief that the conversation would remain private. *See Plate v. State*, 925 P.2d 1057, 1066 (Alaska Ct. App. 1996) (scope of clergy-communicant privilege depends upon communicant's reasonable expectations that conversations will remain

[7]Other courts have recognized the privilege although the communicant was not a member of the clergy member's church or faith. *See, e.g., Nicholson v. Wittig*, 832 S.W.2d 681 (Tex. Ct. App. 1992) (clergy privilege applied to statements made to hospital chaplain); *Commonwealth v. Shallenberger*, 38 Pa. D. & C.3d 201 (Pa. Com. Pl. 1985) (defendant's confidential conversations with two clergy members protected despite fact that one clergy member was not defendant's pastor). As one court stated, the "clergy [member]'s door should always be open; [the clergy member] should hear all who come regardless of their church affiliation." *Swenson*, 237 N.W. at 590.

private); *Nicholson v. Wittig*, 832 S.W.2d 681, 685 (Tex. Ct. App. 1992) (privilege attaches when a person makes a communication with a reasonable expectation of confidentiality to a clergy member acting in his or her spiritual capacity); *In re Grand Jury Investigation*, 918 F.2d 374, 385, 118 A.L.R. FED. 725 (3rd Cir. 1990) (same); *State v. Cox*, 87 Or. App. 443, 742 P.2d 694, 695 (1987) (for statement to be confidential, communicant must speak privately with intent it remain private); *People v. Edwards*, 203 Cal. App. 3d 1358, 248 Cal. Rptr. 53, 56 (1988) (clergy member statute requires communications be intended to be in confidence), *cert. denied*, 489 U.S. 1027 (1989); *see e.g., People v. Reyes*, 144 Misc. 2d 805, 545 N.Y.S.2d 653 (1989) (conversation between priest and defendant was privileged where defendant sought spiritual advice from priest with reasonable expectation that conversation remain secret). We focus our inquiry, thus, on the communicant's intent to keep the conversation confidential. *State v. Orfi*, 511 N.W.2d 464, 469 (Minn. Ct. App. 1994).

Here, the State correctly asserts that communications must be confidential to be privileged, but the record does not fully support the State's argument that the communications were not secret. The record indicates that Martin's mother was present in the apartment, but it does not indicate that she was in the room the entire time that Martin confided in Pastor Hamlin. In contrast, Pastor Hamlin testified that for part of the time, Martin's mother left the room while Martin and he talked. He testified that he spoke confidentially with Martin at his apartment outside of the mother's presence. Hamlin also testified that he met privately with Martin for a portion of the time at Madigan Army Medical Center and during the night before Martin turned himself over to police.

The record indicates that Pastor Hamlin spoke confidentially with Martin for some time during each of their three meetings. Although other individuals were present during those instances for at least a part of the time, Martin and Pastor Hamlin were also alone for at least a part of the time. Moreover, the record indicates that Martin met with

Pastor Hamlin with the expectation and intention that his statements to the pastor remain confidential.

■ The record before us, however, does not reflect whether Martin's disclosures took place when his mother or others were present. Martin's communications to Pastor Hamlin are confidential only to the extent the conversations were outside the presence of others. Because the record is imprecise in this regard, we remand to the trial court for further proceedings. The trial court is directed to grant the privilege as to statements made to the pastor while Martin and the pastor were alone. The court is further directed to require disclosure of statements made in the presence of a third party, unless the third party was another clergy member or other person needed to aid the communication.[8]

■ Finally, the State contends that the privilege was waived because Pastor Hamlin discussed portions of Martin's statements with other individuals. We disagree. The communicant is the holder of the privilege, and only

---

[8]Ordinarily, the presence of a third person overhearing a communication will vitiate and undermine the viability of a privilege. *See State v. Gibson*, 3 Wn. App. 596, 598, 476 P.2d 727 (1970), *review denied*, 78 Wn.2d 996 (1971); *Pereira v. United States*, 347 U.S. 1, 6-7, 74 S. Ct. 358, 98 L. Ed. 435 (1954) (presence of third parties negates presumption of privacy). But if the third person is present as a "needed" participant in the consultation, the circle of confidence may be reasonably extended to include the third person without compromising the privilege. *Gibson*, 3 Wn. App. at 599; *see also In re Grand Jury Investigation*, 918 F.2d at 384 (presence of third parties, if essential to and in furtherance of the communication, does not vitiate the requisite confidentiality for the clergy member privilege). Courts have applied this rule in a number of contexts. *See e.g., Orfi*, 511 N.W.2d at 469 (clergy privilege applied although mother of defendant's girl friend talked with clergy member and defendant together for a while after clergy member had already separately met with defendant); *Nicholson*, 832 S.W.2d at 685-86 (under broad construction of "confidential," intermittent presence of hospital personnel did not destroy confidentiality); *In re Grand Jury Investigation*, 918 F.2d at 386 (presence of nonfamily members did not necessarily destroy privilege if their presence was essential to and in furtherance of the communication).

In the present case, this inquiry *may* be relevant because Martin initially hesitated speaking with Pastor Hamlin, and overcame his apprehension only with the help of his mother. According to Pastor Hamlin, Harri's presence and assistance were "essential" in securing Martin's confidence for purposes of his spiritual consultation. But to the extent this rule is applicable in the present case, we leave the necessity of such inquiry to the discretion of the trial court.

the communicant can waive it. *See* 5A TEGLAND, § 184, at 78 (privilege belongs to person making confession); *see also* RCW 5.60.060(2) (attorney may not disclose communications by client without client's consent); RCW 5.60.060(4) (subject to certain requirements and exceptions, physician or other doctor generally may not disclose information learned from patient without patient's consent). Here, the record does not reflect that Martin waived the privilege. So, even if we assume that Pastor Hamlin discussed Martin's communications with two other individuals, Martin did not waive the privilege and it may be properly asserted.

Reversed and remanded for proceedings consistent with this opinion.

MORGAN and HUNT, JJ., concur.

Reconsideration denied August 24, 1998.

Review granted at 137 Wn.2d 1001 (1999).